1  Adam D. Hosmer-Henner, Esq. (NSBN 12779)
   Lucas Foletta, Esq. (NSBN 12154)
2  McDONALD CARANO LLP
   100 W. Liberty, 10th Floor
3  Reno, NV 89501
   Tel: 775 788 2000
4  ahosmerhenner@mcdonaldcarano.com
   lfoletta@mcdoanldcarano.com
5
   *Attorneys for Plaintiffs*
6  *Fair Maps Nevada PAC, Sondra Cosgrove,*
   *Douglas Goodman, and Robert MacDonald*
7

8                **UNITED STATES DISTRICT COURT**

9                    **DISTRICT OF NEVADA**

10 FAIR MAPS NEVADA, a Nevada political        Case No.:
   action committee, SONDRA COSGROVE,
11 DOUGLAS GOODMAN, and ROBERT
   MACDONALD,                                  **PLAINTIFFS' MOTION FOR**
12                                             **PRELIMINARY INJUNCTION**

13            Plaintiffs,

14            v.

15 BARBARA CEGAVSKE, in her official
   capacity as Nevada Secretary of State,
16 JOSEPH P. GLORIA, in his official capacity
   as Clark County Registrar of Voters, DEANNE
17 SPIKULA, in her official capacity as Washoe
   County Registrar of Voters, KRISTINA
18 JAKEMAN, in her official capacity as Elko
   County Clerk, SADIE SULLIVAN, in her
19 official capacity as Lander County Clerk,
   LACEY DONALDSON, in her official
20 capacity as Pershing County Clerk-Treasurer,
   VANESSA STEVENS, in her official capacity
21 as Storey County Clerk-Treasurer, NICHOLE
   BALDWIN, in her official capacity as White
22 Pine County Clerk, SANDRA MERLINO, in
   her official capacity as Nye County Clerk,
23 TAMMI RAE SPERO, in her official capacity
   as Humboldt County Clerk, KATHY LEWIS,
24 in her official capacity as Douglas County
   Clerk-Treasurer, LINDA ROTHERY, in her
25 official capacity as Churchill County Clerk-
   Treasurer, LACINDA ELGAN, in her official
26 capacity as Esmeralda County Clerk-Treasurer,
   LISA C. LLOYD, in her official capacity as
27 Lincoln County Clerk, LISA HOEHNA, in her
   official capacity as Eureka County Clerk,
28 CHRISTOPHER NEPPER, in his official

McDONALD CARANO
100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

capacity as Mineral County Clerk-Treasurer, NIKKI BRYAN, in her official capacity as Lyon County Clerk-Treasurer, and AUBREY ROWLATT, in her official capacity as Carson City Clerk-Recorder,

Defendants.

Plaintiffs Fair Maps Nevada ("Fair Maps"), Sondra Cosgrove, Douglas Goodman and Robert MacDonald by and through their undersigned counsel, respectfully move this Court, pursuant to Federal Rule of Civil Procedure 65 for a Preliminary Injunction enjoining Defendants from requiring Fair Maps to: (1) collect hand signatures, (2) affixed in the physical presence of the Initiative circulator, and (3) by the time prescribed in NRS 295.056(3), June 24, 2020, in order to qualify Amended Initiative Petition C-02-2019 (the "Initiative") for the November ballot.  This Motion is based upon the following Memorandum of Points and Authorities, the Complaint and exhibits thereto, the Declarations filed concurrently herewith, the pleadings and papers on file herein, and such other evidence and argument as the Court may allow.

## I.   <u>INTRODUCTION</u>

Fair Maps proposes to amend the Nevada Constitution to provide for the establishment of an independent redistricting commission to draw Nevada's electoral maps for the State Senate, Assembly and U.S. House of Representatives.  Toward that end and in order to limit partisan gerrymandering, Fair Maps filed the Initiative.  (Ex. A, Decl. of Laura Hale ¶ 4.)

Since the Initiative was filed, however, the Covid-19 pandemic ("Pandemic") has gripped our state and country.  In response, all levels of the government have issued social distancing requirements and stay-at-home directives that preclude the interpersonal contact necessary to gather signatures to qualify the Initiative, and other initiatives, for the 2020 ballot in compliance with existing regulations.

In recognition of this difficulty, Fair Maps requested relief from the Secretary of State (the "Secretary"), Nevada's chief elections officer.  (*Id*. ¶ 20.)  Fair Maps requested that (1) the Secretary extend the deadline for submitting the Initiative for verification (June 24, 2020), (2)

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

clarify that Fair Maps may circulate the Initiative electronically, and (3) clarify that signers may sign the Initiative using electronic signatures. (*Id.*; Compl., Ex. 25, at 3-4.) The Secretary refused, indicating that Nevada statutes preclude both actions. (Hale Decl. ¶ 20; Compl., Ex. 26 at 1.) The Secretary refused notwithstanding the fact that she previously ordered that Nevada's June 9, 2020 primary would be conducted by all mail contrary to certain written requirements of Nevada election law. (*See* Compl., Ex. 19.) This Court recently held that such action was valid under the Secretary's authority pursuant to NRS 293.247(4), which provides that the Secretary may, in connection her duties as chief election offer, "provide interpretations and take other actions necessary for the effective administration of the statutes and regulations governing the conduct of primary, general, special and district elections in this State." *Paher v. Cegavske*, No. 3:20-CV-00243-MMD-WGC, 2020 WL 2089813, at *8-10 (D. Nev. Apr. 30, 2020). The Secretary insists on enforcing her interpretation of the signature gathering requirements as if the stay-at-home directives "had no impact on the rights of candidates and the people who may wish to vote for them." *Esshaki v. Whitmer*, No. 2:20-cv-10831-TGB, 2020 WL 1910154, at *1 (E.D. Mich. Apr. 20, 2020) (extending deadline to accept signatures).

In light of the Secretary's action, this Court should take immediate action to preserve Plaintiffs' constitutionally protected rights to circulate the Initiative and vote on the same. Otherwise, the Secretary's interpretation and application of NRS 295.056(3) and NRS 295.0575(1) and (5) will unduly burden Plaintiffs' constitutionally protected rights.

## II.   STATEMENT OF FACTS

### A.   The Initiative

On November 4, 2019, Fair Maps filed Initiative Petition C-02-2019 pursuant to Article 19, Section 2. (Hale Decl. ¶ 4; Compl., Ex. 1.) If enacted, the Initiative will amend the Nevada State Constitution to provide for an independent redistricting commission to map electoral districts for the Nevada Senate, Assembly and U.S. House of Representatives. (Hale Decl. ¶ 4.) On November 26, 2019, a lawsuit was brought challenging the legal sufficiency of the description of effect appended to the Initiative. (*Id.* ¶ 5.) On January 7, 2020, Fair Maps filed Amended Initiative Petition C-02-2019 to reflect changes made to the description of effect following resolution of the

McDONALD ⟨⟩ CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

case in district court.  (Compl. ¶ 31.)  While Fair Maps continued and will continue to gather signatures in support of the Initiative, the challenger to the Initiative appealed to the Nevada Supreme Court where issues relating to the Initiative remain pending.  (Compl. ¶ 32.)

Pursuant to the Nevada State Constitution, in order to qualify the Initiative for inclusion on the November 2020 ballot, the Initiative must be signed "by a number of registered voters equal to 10 percent or more of the number of voters who voted at the last preceding general election in not less than 75 percent of the counties in the State, but the total number of registered voters signing the initiative petition shall be equal to 10 percent or more of the voters who voted in the entire State at the last preceding general election."  Nev. Const. art. 19, § 2(2).  This year, that means Fair Maps must collect 97,598 signatures.  *Filing a Constitutional Initiative*, Nev. Sec'y of State,   https://www.nvsos.gov/sos/elections/initiatives-referenda/filing-a-constitutional-initiative (last visited May 5, 2020).

NRS 295.056(3) establishes the date by which the proponent of an initiative petition must submit petition documents for verification to the county clerks.  NRS 205.056(3).  Where, as here, the initiative petition proposes an amendment to the Nevada State Constitution, the deadline is the fifteenth day after the primary election.  *Id*.  This year, that date falls on June 24, 2020 as Nevada's primary is scheduled to be held on June 9.  *See id*.  Included with each document of the Initiative must be a circulator's affidavit.  NRS 295.0575.  Pursuant to NRS 295.0575, the affidavit must, among other thing, affirm that the circulator "personally circulated the document," and "the signatures were affixed in the circulator's presence."  NRS 295.0575(1), (5).

## B.    The Pandemic

The COVID-19 pandemic ("Pandemic") has resulted in the near total cessation of public activity in Nevada.  This necessary public health action is the result of the adoption of guidance by the federal government and adherence to legal directives issue by the Governor of the State of Nevada.  On January 30, 2020, the World Health Organization declared that the novel coronavirus (COVID-19) constitutes a Public Health Emergency of International Concern.  (Compl., Ex. 2 at 2.)  On January 31, 2020, President Donald Trump suspended entry into the United States by all foreign nationals who had traveled to China in the past 14 days.  (*Id*., Ex. 3 at 3-6.)  On February

24, 2020, President Trump asked Congress to allocate $2.5 billion for a COVID-19 response.  (*Id*., Ex. 4 at 3.)

On February 25, 2020, the Director of the National Center for Immunization and Respiratory Diseases at the Centers for Disease Control and Prevention ("CDC") announced that "[d]isruption to everyday life may be severe" as a result of the virus.  (*Id*., Ex. 5 at 2.)  Regarding the spread, the Director stated that "[i]t's not so much a question of if this will happen anymore but rather more of a question exactly when this will happen," and called upon the American public to "work with us to prepare."  (*Id*., Ex. 5 at 1.)  On February 26, 2020, CDC officials stated that "[n]on-pharmaceutical interventions or NPIs will be the most important tools in our response to this virus," and that such NPIs included "social distancing measures."  (*Id*., Ex. 6 at 1-2.)  On February 27, 2020, the CDC issued further guidance recommending that affected local communities practice "social distancing" measures, including reducing the frequency of large gatherings and limiting the number of attendees.  (*Id*., Ex. 7.)  On March 13, 2020, the President declared a national state of emergency regarding COVID-19.  (*Id*., Ex. 8 at 2-3.)

On March 16, the President recommended broad social distancing guidelines for all Americans to "slow the spread" of COVID-19.  (*Id*., Ex. 10.)  The guidance was initially for a fifteen-day effective period.  (*Id*.)  On April 2, 2020, President Trump extended the for thirty-days.  (*Id*., Ex. 11.)  The CDC also issued guidance requesting that Americans engage in social distancing, including, but not limited to, maintaining a distance of six feet between persons.  (*Id*., Ex. 9.)

President Trump's social distancing guidelines focus on reducing interpersonal contact of all Americans.  His guidelines recommend the following actions, among others:

- Listen to and follow the direction of your **STATE AND LOCAL AUTHORITIES**

- **IF YOU FEEL SICK**, stay home.  Do not go to work.  Contact your medical provider.

- **IF SOMEONE IN YOUR HOUSEHOLD HAS TESTED POSITIVE** for the Coronavirus, keep the entire household at home.  Do not go to work.  Do not go to school.  Contact your medical provider.
- **IF YOU ARE AN OLDER PERSON**, stay at home and away from other people.
- **IF YOU ARE A PERSON WITH A SERIOUS UNDELRYING HEALTH CONDITION** that can put you at increased risk . . . , stay  home and away from other people.  (*Id*., Ex. 11 at 1.)

The President's guidance includes direction specifically for people that are healthy:

- Work or engage in schooling **FROM HOME** wherever possible.
- **AVOID SOCIAL GATHERINGS** in groups of 10 or more people.
- Avoid eating and drinking at bars, restaurants, and food courts—**USE DRIVE-THRU, PICKUP, OR DELIVERY OPTIONS**.  (*Id*., Ex. 11 at 2.)

On March 12, 2020 Governor Sisolak issued a Declaration of Emergency to facilitate the State's response to the Pandemic.  (*Id*., Ex. 12.)  Since issuing the Declaration of Emergency, Governor Sisolak has issued several legal directives consistent with the President's guidelines and the CDC's recommendations drastically limiting interpersonal contact in Nevada.

On March 31, 2020, Governor Sisolak issued a "stay at home" order.  (*Id*., Ex. 13.)  In that order, Emergency Directive 010, the Governor extended his March 12 Declaration of Emergency through April 30, 2020.  (*Id*., Ex. 13 § 1.)  He further ordered all Nevadans to stay in their home and not gather socially, subject to certain limited exceptions.  (*Id*., Ex 13 § 2.)

Although Emergency Directive 010 "does not prohibit individuals from engaging in outdoor activity, including without limitation, activities such as hiking, walking, or running," individuals engaging in that activity must comply with Emergency Directive 007, maintain at least 6 feet distancing from other individuals, and not congregate in groups beyond their household members.  (*Id*., Ex. 13 § 6.)  The Governor issued Emergency Directive 007 on March 24, 2020.  (*Id*., Ex. 14.)  That order imposes certain social distancing requirements on Nevadans.  (*Id*.)  Specifically, it provides that, with the exception of persons residing in the same household, Nevadans must "to the extent practicable, abide by social distancing practices by maintaining a

minimum six-foot distance between persons in public spaces, whether privately or publicly owned." (*Id*., Ex. 14 § 2.)   It also requires that local governments limit Nevadans use of recreational spaces. (*Id*., Ex. 14 § 3.)   Individuals that violate the social distancing restrictions in the order are subject to criminal and civil penalties. (*Id*., Ex. 14 §§ 5-6.)

In addition to the restrictions identified above, Governor Sisolak closed non-essential business, including many retail establishments. (*Id*., Ex. 15 §§ 1-3.)   Governor Sisolak also ordered the closure of state buildings. (*Id*., Ex. 16 at 2.)   Local governments have taken similar action and agreed to use their enforcement authority to enforce the Governor's directives. (*Id*., Ex. 17.)   On April 29, 2020, Governor Sisolak extended his stay at home order through May 15, 2020. (*Id.*, Ex. 18 § 8.)

### C.     Signature gathering during the Pandemic

The Governor's actions make it extremely difficult to collect signatures to qualify the Initiative for the ballot in a traditional in-person manner. (Hale Decl. ¶¶ 7-14.)   Under normal circumstances, signatures are gathered using a variety of methods, all of which require interpersonal contact inconsistent with the mandated social distancing. (*Id*. ¶¶ 9-10.)   Eligible voters are contacted door-to-door at their homes, in front of retail establishments, restaurants and entertainment venues, or in or around government buildings to solicit their interest in signing a petition. (*Id*. ¶ 10.)   If, after a brief conversation, an individual is interested in signing the petition, the person signs the same piece of paper—most likely using the same pen—that others have signed. (*Id*.)

In the current environment, traditional signature gathering is extremely difficult and it is implausible that Fair Maps will meet NRS 295.056(3)'s submission deadline. (*Id*. ¶¶ 8, 17.)   Nevadans have been ordered to stay at home. (*Id*. ¶ 12; Compl., Ex. 13.)   Most government buildings are closed. (Compl., Ex. 16 at 2.)   Restaurants, bars and entertainments venues are closed. (Hale Decl. ¶ 12; *see also* Compl., Ex. 15 §§ 1-3.)   Many retail establishments are closed. (*See* Compl., Ex. 15 §§ 1-3.)   Public events have been canceled *en masse*. (Hale Decl. ¶ 12.)   People are prohibited from gathering in parks in substantial numbers, and individuals must adhere

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

7

to the extent practicable to a six-foot social distancing limitation.  (Compl., Ex. 13 § 6, Ex. 14 § 3.)

It is extremely challenging to gather physical ink signatures on hard copy documents in the time allotted as is traditionally done to qualify an initiative petition for the ballot.  (*See* Hale Decl. ¶¶ 8, 16.)  It is equally challenging to satisfy the circulator's affidavit requirement in the traditional manner—by personal observation of signatures affixed in the presence of the circulator.  (*Id*.)

That notwithstanding, with respect to the signatures themselves and the circulator's affidavit requirements, Nevada law may be satisfied through alternative means.  Electronic signatures may be used to execute an initiative petition and the circulator's affidavit requirement is satisfied where the circulator circulates a petition electronically for electronic signature.  Electronic signatures are widely utilized in Nevada in other contexts, including, court filings, business license filings, and corporate filings.  *See, e.g.*, NRS 75.070 (defining "Sign" for purposes of NRS Chapter 75, General Provisions Title 7, Business Associations, Securities and Commodities).

As detailed below, any application of the statutes to require otherwise impermissibly infringes Plaintiffs' constitutional rights, both state and Federal.

### D. Nevada and other states have taken action to protect political speech in light of COVID-19

On March 24, 2020, the Secretary announced that Nevada would conduct its June 9, 2020 primary election by all mail out of concerns for the health and safety of voters and poll workers related to the Pandemic.  (Compl., Ex. 19.)  In doing so, the Secretary authorized all Nevada voters to vote by absentee ballot and required that all registered voters in Nevada be mailed an absentee ballot.  (*Id*.)  No voter will be required to request an absentee ballot to receive one; however, the Secretary also ordered that one polling place in each county be available to voters "accommodate same-day voter registration, as well as assist voters who have issues with the ballot that was mailed to them."  (*Id*.)

In mandating that the primary be conducted by all mail, the Secretary did so despite the fact that an all-mail primary conflicts with certain provisions of Nevada election law, including the following: NRS 293.272, which requires that most Nevadans who register to vote by mail or computer must, for the first election in which the person votes at which that registration is valid, vote in person unless he or she has previously voted in the county in which he or she is registered to vote.

In addition to taking precautions to safeguard the primary election, the Secretary has suspended in person transactions at her office and is accepting all election filings electronically. (Compl., Ex. 20.)  Other jurisdictions in the United States have responded to the Pandemic by changing election processes and rules for elections and petitions to accommodate political speech in the midst of the Pandemic.

Ohio postponed their 2020 primary election until April 28, 2020.  (Compl., Ex. 21.)  Ohio conducted the election almost exclusively by mail and vote centers only opened for people with disabilities to vote in person.  (*see id.*).  On March 25, 2020, a Virginia state court granted a preliminary injunction and ordered a reduction in the number of signatures needed for candidates to enter Virginia's primary election from 10,000 to 3,000.  The court found that "the circumstances as they exist in the Commonwealth of Virginia and across the United States are not normal right now," and that the regulations requiring the signatures were not narrowly tailored because they "do[ ] not provide for emergency circumstances, like those that currently exist." *Faulkner v. Va. Dep't of Elections*, No. CL 20-1456, slip op. at 3 (Va. Cir. Ct. Mar. 25, 2020) (attached to the Complaint as Exhibit 22).

On April 17, 2020, the Massachusetts Supreme Judicial Court, Massachusetts' highest court, ordered three forms of relief for candidates seeking access to the ballot: first a reduction in the signature requirements by 50%, second an extension of the deadlines for filing of signatures, and third, a requirement that the Secretary of State accept electronic rather than wet-ink original signatures.  The court agreed with petitioners that "these extraordinary times of a declared state of emergency arising from the COVID-19 pandemic create an undue burden on prospective

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

1  candidate's constitutional right to seek elective office." *Goldstein v. Sec'y of Commonwealth*, 142

2  N.E.3d 560, 564 (Mass. 2020) (attached to the Complaint as Exhibit 23.)

3  On April 20, 2020, a federal court in Michigan granted a motion for preliminary injunction

4  reducing the state signature requirement for a candidate to Michigan's Eleventh Congressional

5  District after finding that "the State's actions in the form of enforcing both the Stay-at-Home

6  Order and the statutory ballot-access requirements operate in tandem to impose a severe burden"

7  on the Plaintiff. *Esshaki*, 2020 WL 1910154, at *1 (attached to the Complaint at Exhibit 24.)

8  **E      Nevada Secretary of State and the Initiative**

9  On April 20, 2020, Fair Maps' counsel contacted the Secretary and made two requests.

10  (Hale Decl. ¶ 20.)  Fair Maps requested that the Secretary authorize Fair Maps to circulate the

11  Initiative electronically and allow signers to sign electronically.  (Compl., Ex. 25 at 3.)  Plaintiff

12  also requested that the Secretary extend the deadline for submission of the Initiative for

13  verification by at least six weeks.  (*Id.*, Ex. 25 at 4.)  By letter of the same day, the Secretary

14  denied Plaintiff's requests.  (*Id.*, Ex. 26 at 1.)

15  **III.   LEGAL STANDARD**

16  Federal Rule of Civil Procedure 65 governs the issuance of preliminary injunctions.  Fed.

17  R. Civ. P. 65.  To qualify for a preliminary injunction, a plaintiff must satisfy four requirements:

18  "(1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance

19  of equities favors the plaintiff; and (4) that the injunction is in the public interest." *Paher*, 2020

20  WL 2089831, at *4. "A plaintiff may also satisfy the first and third prongs by showing serious

21  questions going to the merits of the case and that a balancing of hardships tips sharply in plaintiff's

22  favor." *Id.* (citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)).

23  **IV.   ARGUMENT**

24  As articulated below, Plaintiffs have met their burden with respect to these factors and

25  therefore a preliminary injunction should issue.

26  //

27  //

28  //

McDONALD ⋀ CARANO
100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

**A.  Plaintiffs are entitled to a preliminary injunction because Plaintiffs will suffer irreparable harm if their constitutional rights are infringed.**

Precluding the inclusion of the Initiative on the November ballot will unconstitutionally infringe Plaintiffs' right to engage in political speech by circulating and, in the case of individual voters, voting on, an amendment to the Nevada Constitution.  This infringement constitutes irreparable injury for which the issuance of a preliminary junction is appropriate.  *See Sanchez v. Cegavske*, 214 F. Supp. 3d 961, 976 (D. Nev. 2016) (citing *Cardona v. Oakland Unified Sch. Dist., Cal*., 785 F. Supp. 837, 840 (N.D. Cal. 1992) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury.")).  In the cases of impairment of constitutional rights, courts have regularly held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)); *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).  The Ninth Circuit has held that the harm is "particularly irreparable where . . . a plaintiff seeks to engage in political speech, as 'timing is of the essence in politics' and '[a] delay of even a day or two may be intolerable.'" *Klein*, 584 F.3d at 1208 (second alteration in original) (quoting *Long Beach Area Peace Network v. City of Long Beach,* 522 F.3d 1010, 1020 (9th Cir. 2008), amended and superseded, 574 F.3d 1011 (2009)).

Here, COVID-19 and the related social distancing measures imposed by federal, state and local government make it highly unlikely that Fair Maps will be able to satisfy Nevada's statutory requirements for qualifying the Initiative for the November 2020 ballot.  As Laura Hale states in her declaration, it is not feasible to gather ink signatures on a petition circulated by hand in an environment where interpersonal contact is generally advised against and in many cases prohibited.  (Hale Decl. ¶¶ 8-14.)  Any attempt to gather signatures would subject petition circulators and the general public to a health risk, and expose circulators to potential criminal and civil liability.  (*Id*.; *see also* Compl., Ex. 14 §§ 5-6.)

What's more, voters are particularly likely in the current environment to avoid petition circulators, especially those at heightened risk for COVID-19 complications.  As Robert

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

MacDonald states in his declaration, as a voter with a heightened risk of COVID-19 complications, he has heeded the social distancing guidance and mandates and essentially sheltered in place since they were imposed. (Ex. B, Decl. of Robert MacDonald ¶ 6.) Although he would like to sign the Initiative, he does not feel comfortable engaging in the interpersonal contact necessary to do so. (*Id.* ¶ 7.) Thus, even if the Initiative could be circulated, voters would likely avoid contact with the circulators.

The difficulty of gathering the requisite signatures in the current environment is exacerbated by the fact that there is no clear indication when the social distancing mandates will be lifted—to say nothing of when Nevadans will feel comfortable leaving their homes and engaging with signature gatherers. The Governor has extended his own stay-at-home order twice already, and it now will stand through at least May 15, 2020. (Compl., Ex. 18 § 8.) Consequently, it is unlikely that social distancing will be eased in time for Plaintiffs to qualify the Initiative for the November ballot in the traditional manner by June 24, 2020.

In light of these facts, requiring Fair Maps to gather close to 100,000 ink signatures by June 24 is implausible. Consequently, the Secretary's interpretation that the Initiative cannot be circulated electronically for electronic signature and her refusal to allow the Initiative to be submitted for verification after June 24, 2020 will cause Plaintiffs to lose the opportunity to qualify the Initiative for the ballot and to vote for the same. As constitutionally protected activity, the Secretary's intransigence will therefore cause irreparable harm. There is no remedy available to give effect to these rights or compensate Plaintiffs for their loss. An injunction preventing the harm from occurring is the only suitable remedy.

## B. Plaintiffs are entitled to a preliminary injunction because they are likely to succeed on the merits of their claims.

Plaintiffs have a likelihood of success on at least one, if not all, of their claims against Defendants. Plaintiffs allege thirteen claims. There are six claims relating to the constitutionality of the Secretary's failure to extend the deadline for submitting the Initiative for verification no later than June 24, 2020 and six claims relating to the Secretary's interpretation that NRS 295.0575 will not accommodate the use of electronic means to circulate and sign the Initiative. (Compl. ¶¶

McDONALD ⬥ CARANO
100 WEST LIBERTY STREET, TENTH FLOOR ⬥ RENO, NEVADA 89501
PHONE 775.788.2000 ⬥ FAX 775.788.2020

76-168.)   Plaintiffs also seek a declaratory order that the Secretary's interpretation of NRS 295.0575 is incorrect.  (*Id.* ¶¶ 169-174.)

Plaintiffs' constitutional claims allege that the Secretary's actions violate their right to engage in political speech by preventing them from circulating and qualifying the Initiative for the November ballot 2020 and further prevents them from voting on the Initiative in the November election.  (*Id.* ¶¶ 76-168.)  Plaintiffs claim that these actions violate the First and Fourteenth Amendments to the U.S. Constitution and various provisions of the Nevada Constitution, including Article 9, Section 1 (right to speech), Article 19, Section 2(1) (right to circulate an initiative petition), and Article 2, Section 1 (right to vote).  (*Id.*)

Federal courts evaluating challenges to laws that regulate the election process apply the framework from *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992).  Under *Burdick*'s balancing and means-end fit framework, strict scrutiny is applied when the First or Fourteenth Amendment rights are subject to "'severe' restrictions."  *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016) (quoting *Burdick*, 504 U.S. at 434).   However, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions."  *Id.*

### i.   The challenged requirements impose a severe burden on Plaintiffs' constitutional rights.

The challenged requirements impose a severe burden on Plaintiffs' First Amendment Rights by impeding their ability earn a place on the ballot.  What's more, they prevent Plaintiffs and other Nevada voters from voting on the Initiative in the November election.  These restrictions are undoubtedly severe and therefore strict scrutiny applies to the challenged restrictions.  *Angle v. Miller*, 673 F.3d 1122, 1133 (9th Cir. 2012).  The United States Supreme Court has held that the circulation of ballot petitions is "core political speech" where First Amendment protection is at its "zenith."  *Meyer v. Grant*, 486 U.S. 414, 421-422, 425 (1988).  The Nevada Supreme Court has clarified that Nevadans' right to engage in political speech as articulated by the Nevada Constitution, including the right to circulate a ballot petition, is subject to First Amendment

13

analysis. *Univ. & Cmty. Coll. Sys. of Nev. v. Nevadans for Sound Gov't*, 100 P.3d 179, 187 (Nev. 2004) (concluding that the protections afforded by Article 1, Section 9 and Article 19, Section 2 are subject to First Amendment analysis).

In light of the restrictions imposed by the government in response to the Pandemic, requiring that the Initiative be submitted for verification no later than June 24, 2020 and precluding the use of electronic means to circulate and sign the Initiative cannot withstand strict scrutiny.

As Laura Hale points out in her declaration, in the current environment traditional signature gathering is extremely difficult and it is implausible that Plaintiff will meet NRS 295.056(3)'s submission deadline. (Hale Decl. ¶¶ 8, 17.) Nevadans have been ordered to stay at home, and most government buildings are closed. (*Id*. ¶ 12; Compl., Ex. 13 § 2, Ex. 16 at 2.) Restaurants, bars and entertainments venues are closed. (Hale Decl. ¶ 12; *see also* Compl., Ex. 15 §§ 1-3.) Many retail establishments are closed. (*See* Compl., Ex. 15 §§ 1-3.) Public events have been canceled *en masse*. (Hale Decl. ¶ 12.) These are all places Fair Maps had intended to send circulators. (*Id*. ¶ 11.)

What's more, individuals must adhere to the extent practicable to a six-foot social distancing limitation. (Compl., Ex. 14 § 2.) Thus, as Douglas Goodman points out, even if he wanted to circulate the Initiative, it would be practically impossible to do so without breaching the six-foot social distancing limit. (Ex. C, Decl. of Douglas Goodman ¶¶ 7-8.)

Even if the Initiative could somehow be circulated at a distance, voters would be reticent to sign. As Robert MacDonald states, he wants to sign the Initiative but cannot do so because he is strictly adhering to social distancing protocols. (MacDonald Decl. ¶ 7.) As a person with a preexisting condition that presents a higher likelihood of severe COVID-19 complications, he does not feel comfortable risking interpersonal contact to sign the Initiative. (*Id*. ¶¶ 5-7.)

The combination of the closure of public spaces, the prohibition on public gatherings, and the requirement to maintain social distancing makes it highly unlikely Plaintiffs will qualify the Initiative for the ballot. Complicating matters is the fact that, as explained above, it is not clear when these restrictions will be lifted. Even if the social distancing restrictions were eased today, it is unlikely Plaintiffs would have a reasonable opportunity to qualify the Initiative for the ballot.

1    Consequently, voters like Sondra Cosgrove who have already signed the Initiative and want to

2    vote on it in November will not be able to do so.  (Ex. D, Decl. of Sondra Cosgrove ¶¶ 6-9.)

3           **ii.     The State's interest in preventing fraud and ensuring the Initiative is
                       properly verified does not justify the burden impose by the challenged
4                      restrictions.**

5           There is no government interest that justifies the near-total abridgment of Plaintiffs'

6    constitutional rights in this election cycle.

7                           **a.     Electronic circulation and signing**

8           Circulating the Initiative electronically and allowing electronic signatures will satisfy the

9    State's interest in preventing fraud.  Electronically transmitted documents and signatures are relied

10   upon—and legally recognized as valid—in a number of contexts, including general business

11   transactions.  *E.g.*, NRS 75.070 (for purposes of Title 7 of the NRS (Business Associations,

12   Securities and Commodities) defining "Sign" to mean "with the present intent to authenticate or

13   adopt a record or identify oneself: 1. To execute or otherwise adopt a tangible symbol, name, word

14   or mark, including, without limitation, any manual, facsimile or confirmed signature; or 2. To

15   attach to or logically associate with an electronic transmission an electronic sound, symbol or

16   process, including, without limitation, an electronic signature, in an electronic transmission.").

17          The State's interest against the occurrence of fraud is no less significant in these areas than

18   in the area of initiative petitions.  Consequently, there is no reason the State's interest in preventing

19   fraud with respect to initiative petitions should require a heightened standard, particularly, where

20   as here, doing so would prevent Plaintiffs from exercising their constitutional rights.

21          That this is the case is underscored by the fact that discrepancies in the physical signatures

22   compared by county clerks in the verification process (as between the signature on the initiative

23   petition and that on file with the registrar) is not a basis for disqualifying the signature.  NRS

24   295.260(3) (providing that "a petition must not be certified insufficient for lack of the required

25   number of valid signatures if, in the absence of other proof of disqualification, any signature on

26   the face thereof does not exactly correspond with the signature appearing on the file or list of

27   registered voters used by the county or city clerk and the identity of the signer can be ascertained

28   from the face of the petition").

McDONALD CARANO
100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

It is further underscored by the fact that an electronic verification process is used in voter registration.  As Deputy Secretary of State Wayne Thorley pointed out in *Paher*, "When voter registration applicants register (1) by mail, (2) through the DMV by appearing in person or using the DMV's on-line system, or (3) via the Secretary of State's on-line system, the overwhelming majority of those applicants are positively matched to the personal identifiers on file with the [Department of Motor Vehicles] or the [Social Security Administration]. The match is made through automated systems, and to the best of my knowledge, the systems are highly reliable." (Ex. E ¶ 2.)  Thus, there is no clear State interest in insisting that physical signatures be employed on a physically and personally circulated initiative petition.

Perhaps more importantly, the Secretary's interpretation of NRS 295.0575 to preclude the electronic circulation and signing of the Initiative is incorrect.  The plain language of NRS 295.0575 allows for the electronic circulation and signing of the Initiative.  NRS 295.0575(1) requires that "the circulator personally circulated the document."  NRS 295.0575(1).  However, there is nothing in the statute that precludes the circulator from personally circulating the document by electronic means.  Any interpretation otherwise would read into the statute a requirement that does not exist.

NRS 295.0575(5) provides that the circulator must affirm "[t]hat all the signatures were affixed in the circulator's presence."  NRS 295.0575(5).  However, the statute does not require a hand signature, nor does it require that the circulator be physically present.  Thus, like with respect to other requirements of NRS 295.0575, the Secretary's interpretation requires one to read language into the statute that does not exist.  Despite her contention, electronic signatures may be used to execute the Initiative and the circulator's presence may be deemed present by way of the electronic circulation of an initiative petition that is signed electronically.

Even if the statute could be construed to require hand signatures and the personal physical circulation of the Initiative, in the current environment electronic circulation and electronic signatures constitutes substantial compliance such that the requirements of the statute are satisfied. In *Las Vegas Convention and Visitor's Authority*, 124 Nev. 669 (2020) the Nevada Supreme Court has held that substantial compliance with the circulator's affidavit requirements is sufficient to

prove compliance with the statute. *Las Vegas Convention and Visitor's Auth. v. Miller*, 191 P.3d 1138, 1149 (Nev. 2008). In an environment where interpersonal contact is not possible, the electronic circulation and signing of the Initiative meets the substantial compliance standard. *See id.* (holding that substantial compliance occurs where each element of the circulator's affidavit is attempted). Such compliance is no less reliable than the traditional means.

### b. The verification deadline

As to the State's interest in ensuring that the Initiative is properly verified, that interest too can be satisfied through a means that does not prevent Plaintiffs from exercising their constitutional rights. Submitting the Initiative for verification on June 24, 2020 will afford the county clerks 131 days to verify the Initiative, notify the Secretary of that fact and for ballots to be printed. *See* NRS 295.056(3) (calculating days from June 24, 2020 through November 3, 2020, the date of the general election). Allowing Plaintiffs additional time to secure the requisite signatures will not prevent the county clerks from having the time they need to verify the Initiative. That process can be accomplished in less than the time traditionally allotted.

### iii. Other courts that have considered the impact of COVID-19 have taken action similar to what Plaintiffs request here.

In *Esshaki v. Whitmer*, the District Court for the Eastern District of Michigan enjoined several of Michigan's requirements for signature gathering for candidate ballot access as severe burdens unsupported by a compelling state interest in light of the COVID-19 pandemic. In doing so, the court stated that the State's social distancing order "ha[ve] pulled the rug out from under [candidates'] ability to collect signatures," have "shuttered" the locations and events at which signatures are normally gathered, leave only "prohibitively expensive" means to obtain signatures. *Esshaki*, 2020 WL 1910154, at *6. The court stated further that "[a]bsent relief, Plaintiff[ ] lack[s] a viable, alternative means to procure the signatures he needs" and thus "he faces virtual exclusion from the ballot." *Id.*

The court then addressed COVID-19 specifically, noting that it "ha[d] little trouble concluding that the unprecedented—though understandably necessary—restrictions on daily life . . . when combined with the ballot access requirements . . . have created a severe burden on

McDONALD CARANO

100 WEST LIBERTY STREET, TENTH FLOOR • RENO, NEVADA 89501
PHONE 775.788.2000 • FAX 775.788.2020

Plaintiff's exercise of his free speech and free association rights under the First Amendment, as well as his due process and equal protection rights under the Fourteenth Amendment—as expressed in his effort to place his name on the ballot for elective office." *Id.* (footnote omitted).

The court also rejected the State's argument that its interest in ensuring that candidates have sufficient support to qualify for the ballot justified the signature requirement at issue. The court concluded that the social distancing restrictions dictated by COVID-19 "effectively halted signature-gathering by traditional means, reducing the available time prescribed by the Michigan Legislature to gather one thousand signatures by twenty-nine days." *Id.* at \*7. The remedy ordered by the court was to "reduce the signature requirement to account for the lost twenty-nine days." *Id.* The court entered an injunction that (1) reduced by half the number of signatures required for ballot access, (2) extended the deadline to submit signatures, and (3) required the state to implement a "user-friendly" system to "permit signatures to be gathered through the use of electronic mail" and to permit the signature to be "appropriately witnessed . . . through digital means." *Id.* at \*10.

The *Esshaki* court is not the only one to take such action. In *Faulkner*, a Virginia state court entered an injunction reducing the signature requirement for candidates to qualify for the ballot in light of COVID-19, concluding that Virginia's signature requirement as applied to the plaintiff-candidate infringed on his First Amendment rights. *Faulkner*, slip op. at 2-4 (attached as Ex. 24 to the Complaint).

In *Democratic National Comittee v. Bostelmann*, the District Court for the Western District of Wisconsin extended the deadline to request absentee ballot, the deadline to postmark absentee ballot to election day, and deadline for absentee ballots to be received to six days after election, in light of severe burdens caused by COVID-19 and the undue burden otherwise applicable statutory requirements worked on the plaintiffs' constitutional rights. No. 20-cv-249-wmc, 2020 WL 1638374 at \*22 (W.D. Wis. Apr. 2, 2020).

This Court should reach the same conclusion that other courts have reached, that the unprecedented restrictions on social interaction dictated by COVID-19 and related government

guidance and prohibitions makes the State's action to prevent Plaintiffs from exercising their constitutional rights untenable and unconstitutional.

**C.    Plaintiffs are entitled to a preliminary injunction because the balance of equities and public interest favor Plaintiffs**

Where the government is a party, the Court must consider the balance of equities and public interest in relation to the issuance of a preliminary injunction together. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). In doing so, the Court must "balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (citation omitted).

In this case, the balance of equities and the public interest demand that a preliminary injunction issue.  In the absence of action by this Court, Plaintiffs' constitutional rights will be abridged, irreparably harming Plaintiffs who will have no reasonable recourse in the absence of injunctive relief.  The harm caused will damage not only Plaintiffs' constitutional rights but also the integrity of Nevada's political process to the detriment of all Nevadans.  In light of the fact that the interest of the State at stake can be satisfied through less restrictive means, there is no reason not to grant the relief requested.  *See Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) ("[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976))); *Warsoldier v. Woodford,* 418 F.3d 989, 1001 (9th Cir. 2005) (recognizing that a "colorable First Amendment claim" is "irreparable injury sufficient to merit the grant of relief").

While the State may have an interest in the orderly conduct of elections and of preventing ballots from being crowded with non-serious initiatives, these interests are not undermined by the relief sought by Plaintiffs.

**V.    <u>CONCLUSION</u>**

In light of the foregoing, the Court should grant Plaintiffs' request for a preliminary injunction on an expedited basis.  COVID-19 and social distancing restrictions make it highly unlikely Plaintiffs will be able to exercise their constitutional rights to engage in political speech, place the Initiative on the ballot, and vote on measures of their choices.  Consequently, the

Secretary's interpretation of NRS Chapter 295 in the current climate and the Secretary's failure to authorize alternative means to satisfy the procedural requirements for qualifying the Initiative for the November ballot effects an unconstitutional violation of Plaintiffs' rights.  This Court must take action to preserve those rights and prevent Plaintiffs from suffering irreparable harm.

DATED: May 6, 2020                                Respectfully submitted:


By  /s/ Adam Hosmer-Henner
     Adam D. Hosmer-Henner, Esq. (NSBN 12779)
     Lucas Foletta, Esq. (NSBN 12154)
     McDONALD CARANO LLP
     100 W. Liberty, 10th Floor
     Reno, NV 89501
     Tel: 775 788 2000
     ahosmerhenner@mcdonaldcarano.com
     lfoletta@mcdoanldcarano.com

     Counsel for Plaintiffs

20

## INDEX OF EXHIBITS

| EXHIBIT # | DESCRIPTION | NUMBER OF PAGES |
|---|---|---|
| A | Declaration of Laura Hale | 5 |
| B | Declaration of Robert MacDonald | 3 |
| C | Declaration of Douglas Goodman | 3 |
| D | Declaration of Sondra Cosgrove | 3 |
| E | Declaration of Wayne Thorley | 5 |

4834-4969-9515, v. 2