1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

FAIR MAPS NEVADA, *et al.*,

                 Plaintiffs,

    v.

BARBARA CEGAVSKE, in her official capacity as Nevada Secretary of State, *et al.*,

                 Defendants.

Case No. 3:20-cv-00271-MMD-WGC

ORDER

## I.   SUMMARY

The Court issues this order during the pandemic caused by the novel coronavirus SARS-CoV-2 that emerged at the end of 2019 ("COVID-19"). COVID-19 is central to Plaintiffs' challenge to a decision made by Defendant[1] Barbara Cegavske, Nevada's Secretary of State ("the Secretary"). More specifically, Plaintiffs[2] seek to place an initiative on the November 2020 ballot that would amend Nevada's State Constitution to create an independent redistricting commission in an effort to combat partisan gerrymandering. (ECF No. 1 at 1-4.) In light of COVID-19 and related stay-at-home orders, Plaintiffs asked the Secretary for an extension of the statutory deadline to submit the required signatures in support of their initiative, and a waiver of certain in-person requirements regarding the collection of signatures, but she refused, explaining she had no authority under the applicable statutes to grant their request. (*Id.* at 14.) This lawsuit followed.

---

[1]The other Defendants are county elections officials across Nevada: Aubrey Rowlatt and Joseph P Gloria; and Kristina Jakeman, Sadie Sullivan, Lacey Donaldson, Vanessa Stevens, Nichole Baldwin, Sandra Merlino, Tammi Rae Spero, Kathy Lewis, Linda Rothery, Lacinda Elgan, Lisa C. Lloyd, Lisa Hoehne, Christopher Nepper, and Nikki Bryan (collectively, "Rural County Defendants"). (ECF No. 1 at 4-6.)

[2]Plaintiffs are Fair Maps Nevada, a Nevada political action committee ("Fair Maps"), Sondra Cosgrove, Douglas Goodman, and Robert MacDonald. (ECF No. 1 at 2.)

1    Before the Court is Plaintiffs' motion for a preliminary injunction, asking the Court

2    to compel the Secretary to extend the deadline and waive the in-person requirements ("PI

3    Motion").[3] (ECF No. 2.) The Court held a telephonic hearing on the PI Motion on May 21,

4    2020 (the "Hearing"). (ECF No. 38.) Nevada's Governor's emergency restrictive orders

5    effectively barred Plaintiffs from circulating their initiative petition for signature for a period

6    of about six weeks. Such circumstances compel a finding that Plaintiffs have shown they

7    are likely to prevail on the merits of their as applied challenge as to the statutory provision

8    setting the deadline, but not the in-person requirements—and as further explained

9    below—the Court will grant the PI Motion in part, and deny it in part.

10   **II.    BACKGROUND**

11   The following facts are taken from the Complaint and exhibits attached thereto as

12   well as the briefing and evidence submitted concerning the PI Motion. The Court begins

13   by briefly outlining the state constitutional and statutory scheme that governs Plaintiffs'

14   attempt to get its initiative petition to amend Nevada's constitution on the November 2020

15   ballot.

16   **A.    Nevada's Ballot Initiative Scheme**

17   The people of Nevada reserved their right to amend Nevada's constitution through

18   initiative petitions when they enacted it. *See* Nev. Const. art. XIX, § 2(1). But a certain

19   percentage of Nevada voters must support a proposed constitutional amendment in a

20   ballot initiative for it to appear on the general election ballot for approval by a majority of

21   Nevada's citizens. *See* Nev. Const. art. XIX, § 2. More specifically:

22   "An initiative petition shall be in the form required by section 3 of this article
     and shall be proposed by a number of registered voters equal to 10 percent

23   or more of the number of voters who voted at the last preceding general
     election in not less than 75 percent of the counties in the state, but the total

24   number of registered voters signing the initiative petition shall be equal to 10
     percent or more of the voters who voted in the entire state at the last

25   preceding general election."

26   _____

27   [3]The Secretary filed a response. (ECF No. 24.) So did Rural County Defendants.
     (ECF No. 19.) Defendants Rowlatt and Gloria joined the Rural County Defendants'
     response. (ECF Nos. 27, 28.) Intervenor-Defendants Nevada Resort Association PAC and

28   Leonard Jackson also filed a response. (ECF No. 15-3.) Plaintiffs filed a reply. (ECF No.
     35.)

1   *Id.* § 2(2). As mentioned, Fair Maps seeks to propose a constitutional amendment through

2   a ballot initiative. (ECF No. 1.) That means that Fair Maps must collect 97,598 signatures

3   to get its proposed initiative on the November 2020 ballot. (ECF No. 2 at 4.)

4        Proponents of a petition that garners the required minimum number of signatures

5   must send a copy of their petition to the Secretary "not less than 90 days before any regular

6   general election at which the question of approval or disapproval of such amendment may

7   be voted upon by the voters of the entire state[]"—*i.e.*, to get the petition on the ballot in

8   the fall. Nev. Const. art. XIX, § 2(4). The proponents must also stop circulating the petition

9   at that time, or earlier if required by statute. *See id.*

10       The Nevada Legislature has enacted such a statute, which requires proponents of

11  an initiative proposing a constitutional amendment submit documents to all of Nevada's

12  county clerks by the fifteenth day after the primary election before they may be submitted

13  to the Secretary (the "Deadline"). *See* NRS § 295.056(3). Proponents must specifically

14  submit to each county clerk, on the same day, the "document or documents which were

15  circulated for signature within the clerk's county." NRS § 295.056(1), (5). The petition may

16  consist of more than one document. *See* NRS § 295.0575. These documents are intended

17  to allow each county clerk to verify that the proponents of the petition collected a sufficient

18  number of signatures in their county, and that they actually collected the number of

19  signatures they claimed to acquired. *See* NRS § 295.056(3). This year, the Deadline is

20  June 24, 2020. (ECF No. 2 at 4.)

21       As particularly pertinent here, each petition document submitted to each county

22  clerk for verification must include "an affidavit executed by the circulator thereof," stating,

23  in pertinent part: "(1) "[t]hat the circulator personally circulated the document [. . . ; and]

24

25

26

27

28

3

1   (5) "[t]hat all the signatures were affixed in the circulator's presence."[4] NRS § 295.0575(1),

2   (5).

3          Once the county clerks have received the required documents from the initiative

4   petition's proponents, they have four business days to transmit the total number of

5   signatures gathered to the Secretary, and then another nine business days to verify the

6   signatures collected—and another twelve business days to count signatures if it appears

7   the total number of signatures collected is between 90% and 100% of the total amount

8   required. *See* NRS § 295.056(3); NRS § 293.1276(1) (providing the deadline for provision

9   of count to Secretary); NRS § 293.1277(1) (providing deadline for verification); NRS §

10  293.1279(3) (providing deadline for conducting further count verification). (*See also* ECF

11  No. 24 at 19-20.)

12         An initiative petition is deemed filed "as of the date on which the Secretary of State

13  receives certificates from the county clerks showing the petition to be signed by the

14  requisite number of voters of the State." NRS § 293.1279(6). Assuming proponents of the

15  initiative petition have gathered enough signatures, the Secretary must then have the full

16  text of the proposed constitutional amendment, along with any explanatory text that will

17  appear on the ballot, published in newspapers of general circulation in each county in

18  advance of the general election, at least three times. *See* Nev. Const. art. XIX, § 2(4). A

19  majority of Nevada's voters must then vote in favor of the proposed constitutional

20  amendment in two successive general elections—and the Secretary must ensure the text

21  of the amendment is exactly the same in both elections for it to become part of Nevada's

22  constitution. *See id.* After the second successful vote, the proposed constitutional

23  amendment "shall, unless precluded by subsection 5 or 6, become a part of this

24  constitution upon completion of the canvass of votes by the supreme court." *Id.*

25  ///

26

27

28         [4]The Court collectively refers to these requirements as the "In-Person
    Requirements" in this order.

### B.   The Stay-at-Home Orders

Nevada Governor Steve Sisolak took escalating and then de-escalating action in response to the spread of COVID-19 in Nevada. On March 12, 2020, he declared a state of emergency. (ECF No. 1-12.) On March 20, 2020, he ordered the closure of all non-essential businesses in the state. (ECF No. 1-13 at 2-3.) On March 30, 2020, he issued the "Stay at Home Order," ordering all citizens to stay in their homes until he lifted the order, and forbidding group gatherings outside the home. (*See generally id.*) On May 7, 2020, though effective May 9, 2020, Governor Steve Sisolak lifted the Stay at Home order, though he strongly encouraged Nevada citizens to stay at home, limited gatherings to ten people or less, and imposed public health restrictions. *See* Nevada Governor Steve Sisolak, *Declaration of Emergency Directive 018*, at § 7 (last visited May 28, 2020).[5] Thus, Nevadans were required to stay at home from March 30 through May 9, or approximately six weeks. Moreover, none of the orders include a carve-out for activities protected by the First Amendment, such as collecting signatures to support a ballot initiative. (*See, e.g.*, ECF No. 1-13 at 3-4.)

### C.   Plaintiffs' Proposed Ballot Initiative

Fair Maps filed Initiative Petition C-02-2019 on November 4, 2019. (ECF No. 2 at 3.) "If enacted, the Initiative will amend the Nevada State Constitution to provide for an independent redistricting commission to map electoral districts for the Nevada Senate, Assembly and U.S. House of Representatives." (*Id.*) Intervenor-Defendants[6] brought a lawsuit challenging the legal sufficiency of the description of the initiative's effect in late November 2019. (*Id.*) Fair Maps changed the description in response to that lawsuit, and filed Amended Initiative Petition C-02-2019 (the "Initiative") on January 7, 2020. (*Id.* at 3-

---

[5]*Available at* http://gov.nv.gov/News/Emergency_Orders/2020/2020-05-07_-_COVID-19_Declaration_of_Emergency_Directive_018_-_Phase_One_Reopening_(Attachments)/.

[6]Only Rev. Jackson did (ECF No. 35 at 15), but the Court will refer to him and Intervenor-Defendants interchangeably throughout this order for simplicity.

1   4.) Fair Maps and Intervenor-Defendants continue to litigate the Initiative at the Nevada
2   Supreme Court. (*Id.* at 4.)

3       Meanwhile, Fair Maps began collecting signatures in support of the Initiative. (*Id.*)
4   Plaintiffs collected approximately 10,000 signatures between the middle of January and
5   early March 2020. (ECF No. 35-2 at 5.)[7] Fair Maps began consulting with political
6   professionals experienced with signature gathering, and intended to hire a professional
7   signature-gathering consultant in early April. (*Id.*) Meanwhile, in early 2020, COVID-19
8   began to spread across the United States, prompting escalating response measures from
9   municipal, state, and the federal government, including the Stay at Home order and related
10  orders discussed above. (ECF No. 2 at 4-6.) Governor Sisolak's order closing non-
11  essential businesses closed many of the places groups like Fair Maps would traditionally
12  collect signatures, and imposed social distancing restrictions that make it very difficult to
13  collect signatures in person. (*Id.* at 6-7.) It also prompted Fair Maps to stop collecting
14  signatures. (ECF No. 35-2 at 5.)

15      This leads to the core of Plaintiffs' argument—that COVID-19 and these responsive
16  restrictions have made collecting signatures in-person prohibitive and even dangerous—
17  so the Secretary should extend the Deadline and waive the In-Person Requirements.
18  (ECF No. 2 at 7-8.) Plaintiffs submitted affidavits from five people associated with Fair
19  Maps to substantiate this argument. (ECF Nos. 2-1, 2-2, 2-3, 2-4, 2-5.) Laura Hale also
20  submitted a supplemental declaration with Plaintiffs' reply. (ECF No. 35-2.) As noted
21  above, Plaintiffs asked the Secretary to extend the Deadline by at least six weeks and
22  waive the In-Person Requirements by letter on April 20, 2020. (ECF No. 2 at 10.)

23      **D.    The Secretary's Response and Her Authority**

24      The Secretary responded with a letter on the same day denying Fair Maps' requests
25  ("Denial Decision"). (ECF No. 1-26.) She wrote, "[b]ecause we are unaware of any

26

27      [7]Plaintiffs filed this evidence for the first time with their reply. However, the Court
28  will consider it because it responds to Defendants' arguments raised in opposition to the
    PI Motion, and Defendants (and Intervenor-Defendants) had a chance to address it at the
    Hearing. Nobody disputes the factual accuracy of this information.

6

1  authority by which the Secretary of State can modify the requirements of NRS 295.056,

2  295.0575, 293.12758, whether during a pandemic, natural disaster, or otherwise, we are

3  unable to grant your request." (*Id.* at 2.)

4        Plaintiffs argue that she could have answered differently in pointing out that she

5  decided to conduct the June 9, 2020 primary election entirely by mail. (ECF No. 2 at 8-9.)

6  Plaintiffs also note the Secretary has suspended all in-person transactions in her office in

7  response to COVID-19 concerns. (*Id.* at 9.) They further argue that she could have

8  answered differently in light of fact that election officials and courts in other states have

9  decided to extend, or ordered the extension of, deadlines similar to the Deadline at issue

10 here. (*Id.* at 9-10; *see also* ECF No. 35-1 (consisting of the Governor of Colorado's

11 executive order extending certain similar deadlines in light of COVID-19).)

12       In addition, Plaintiffs argue the Secretary could have exercised some discretion to

13 grant their request in highlighting that the Court recognized the Secretary has some

14 discretionary authority over elections in another recent decision, *Paher v. Cegavske*, Case

15 No. 3:20-cv-00243-MMD-WGC, --- F. Supp. 3d ----, 2020 WL 2089813, at *8-10 (D. Nev.

16 Apr. 30, 2020). (ECF No. 2 at 3.) To inform the Court's legal discussion farther below, the

17 Court will describe the Secretary's discretionary authority as it did in *Paher*. In *Paher*, the

18 Court explained that the Nevada Legislature has authorized the Secretary to enact voting

19 regulations under NRS § 293.124. *See Paher*, 2020 WL 2089813, at *8. The section

20 provides:

21

22        1. The Secretary of State shall serve as the Chief Officer of Elections for this
          State. As Chief Officer, the Secretary of State is responsible for the
          execution and enforcement of the provisions of title 24 of NRS and all other
23        provisions of state and federal law relating to elections in this State.

24        2. The Secretary of State shall adopt such regulations as are necessary to
          carry out the provisions of [the election laws under Title 24—NRS Chapters
25        293–306].

26 NRS § 293.124(1)-(2). Further, NRS § 293.247 pronounces:

27        1. The Secretary of State shall adopt regulations, *not inconsistent* with the
          election laws of this State, for the conduct of primary, general, special and
28        district elections in all cities and counties. *Permanent regulations* of the

7

Secretary of State that regulate the conduct of a primary, general, special or district election and are effective on or before the last business day of February immediately preceding a primary, general, special or district election govern the conduct of that election.
. . .

3.  The regulations must prescribe: [*inter alia*]

(j) Such other matters as determined necessary by the Secretary.

4.   The Secretary of State *may provide interpretations and take other actions necessary* for the effective administration of the statutes and regulations governing the conduct of primary, general, special and district elections in this State.

(Emphasis added.) *See also Paher*, 2020 WL 2089813, at *8.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs preliminary injunctions. "'An injunction is a matter of equitable discretion' and is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 32 (2008)). This relief is "never awarded as of right." *Alliance for the Wild Rockies v. Cottrell* (*"Alliance"*), 632 F.3d 1127, 1131 (9th Cir. 2011) (citation omitted). To qualify for a preliminary injunction, a plaintiff must satisfy four requirements: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of equities favors the plaintiff; and (4) that the injunction is in the public interest. *See Winter*, 555 U.S. at 20. A plaintiff may also satisfy the first and third prongs by showing serious questions going to the merits of the case and that a balancing of hardships tips sharply in

plaintiff's favor. *See Alliance*, 632 F.3d at 1135 (holding that the Ninth Circuit's "sliding scale" approach continues to be valid following the *Winter* decision).

On the merits-success prong, "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

## IV.   DISCUSSION

Plaintiffs bring "six claims relating to the constitutionality of the Secretary's failure to extend the deadline for submitting the Initiative for verification no later than June 24, 2020 and six claims relating to the Secretary's interpretation that NRS § 295.0575 will not accommodate the use of electronic means to circulate and sign the Initiative." (ECF No. 2 at 12.) Plaintiffs generally allege the Secretary's Denial Decision violates their rights under the First and Fourteenth Amendments to the U.S. Constitution, and "various provisions of the Nevada Constitution, including Article 9, Section 1 (right to speech), Article 19, Section 2(1) (right to circulate an initiative petition), and Article 2, Section 1 (right to vote)." (*Id.* at 13.) Defendants and Intervenor-Defendants raise threshold issues that the Court will address before turning to the merits.

### A.   Standing

Intervenor-Defendants argue that Plaintiffs lack standing to assert their claims. (ECF No. 15-3 at 3-6.) The Secretary also alluded to a standing challenge in arguing that there are "unanswered questions in this case about causation[,]" and then clarified she also challenged Plaintiffs' standing at the Hearing. (ECF No. 24 at 23.) As further explained below, the Court finds Plaintiffs have standing.

"Article III of the Constitution limits federal-court jurisdiction to 'Cases' and 'Controversies.'" *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007). "To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable

1  decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167, 180-

2  81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). The party

3  invoking federal jurisdiction bears the burden of establishing these elements. *See*

4  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).

5      Intervenor-Defendants more specifically argue that Plaintiffs cannot establish

6  causation because Plaintiffs have not presented evidence showing they attempted to

7  circulate their Initiative petition, but were "stymied in doing so because of the COVID-19

8  outbreak." (ECF No. 15-3 at 4.) In response, Plaintiffs point to the declaration of Laura

9  Hale attached to their reply brief, where she states that Plaintiffs were collecting signatures

10  until early March. (ECF No. 35 at 17.) Plaintiffs argue this is sufficient evidence to reject

11  Intervenor-Defendants' standing argument. (*Id.*) The Court agrees with Plaintiffs.

12      Plaintiffs have presented evidence showing they were collecting signatures until

13  COVID-19 and the Stay at Home Order made it impossible to collect signatures in person.

14  (ECF No. 35-2.) Moreover, the Court is persuaded by Plaintiffs' argument that, given the

15  circumstances, Plaintiffs will not be able to get their initiative on the ballot unless the

16  Secretary gives them an extension of the Deadline or waives the In-Person Requirements.

17  (ECF No. 35 at 17.)

18      And that overlaps with Intervenor-Defendants' other main argument, which is that

19  Plaintiffs have not shown their alleged harm is redressable because they have not shown

20  what efforts they have taken to qualify their petition, or explained how electronic signatures

21  would work. (ECF No. 15-3 at 6.) Plaintiffs respond that they have presented evidence

22  showing they collected about 10,000 signatures in two months (so support for the Initiative

23  is substantial), are willing to work with the Secretary to develop an electronic means of

24  circulating their petition, and that people are willing to support the Initiative. (ECF No. 35

25  at 19.) Said otherwise, Plaintiffs argue the Secretary could redress their alleged injury. If

26  the Secretary were willing to extend the Deadline or waive the In-Person Requirements—

27  or the Court were to order her to—logically, Plaintiffs would have a much better chance of

28  meeting the signature threshold to get their Initiative on the ballot in November. Thus,

1  Plaintiffs' alleged harm—not getting their Initiative on the ballot—is redressable by the
2  Secretary.

3      Intervenor-Defendants also specifically challenge the standing of the individual
4  plaintiffs. (ECF No. 15-3 at 5; *see also* ECF No. 35 at 16-19 (responding to Intervenor-
5  Defendants' standing arguments directed at Plaintiffs other than Fair Maps).) However, for
6  the reasons explained above, the Court finds that, at a minimum, Fair Maps has standing
7  to bring this case. The Court therefore declines to dismiss this case for lack of standing.
8  *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330 (1999)
9  (stating a case is justiciable so long as one plaintiff has standing).

10      **B.    Subject-Matter Jurisdiction**

11      Both the Secretary and the Rural County Defendants argue the Court should
12  dismiss this case for lack of subject-matter jurisdiction. (ECF Nos. 19 at 6-7, 24 at 14-15.)
13  Defendants in gist contend that Plaintiffs' claims are, in substance, state-law claims
14  because the right to amend the Nevada Constitution comes from that constitution, and the
15  requirements Plaintiffs challenge here are all enshrined in Nevada law. (*Id.*) Defendants
16  therefore argue this case should be in front of a Nevada court.

17      While Defendants may well be correct that, so characterized, a state court may be
18  better situated to consider the relief Plaintiffs request, the Court cannot ignore Plaintiffs'
19  Complaint, which repeatedly invokes federal-question jurisdiction. (ECF No. 1 at 6
20  (alleging federal-question jurisdiction), 15-16 (alleging violation of the First and Fourteenth
21  Amendments of the U.S. Constitution), 17-18 (alleging infringement of due process rights
22  under the U.S. Constitution via 42 U.S.C. § 1983), 18-19 (alleging an undue burden on
23  the Plaintiffs' right to vote under the First and Fourteenth Amendments); *see also id.* at 21,
24  22-23, 24-26, 27-28.) Indeed, Defendants' subject-matter jurisdiction argument ignores a
25  significant portion of Plaintiffs' Complaint seeking relief under the U.S. Constitution—
26  including the prayer for relief, which specifically requests a declaration that the statutes
27  providing the Deadline and the In-Person Requirements are unconstitutional as applied
28  here. (ECF No. 1 at 29.) Defendants do not get to choose what this case is about. Plaintiffs

1  do. *See, e.g.*, *Hawaii ex rel. Louie v. HSBC Bank Nevada, N.A.*, 761 F.3d 1027, 1040 (9th

2  Cir. 2014) (mentioning "the general rule that the plaintiff is the master of a complaint for

3  jurisdictional purposes.").

4        Moreover, Defendants' subject-matter jurisdiction argument ignores the applicable

5  test. (ECF Nos. 19 at 6-7, 24 at 14-15.) "[A] federal court may dismiss a federal question

6  claim for lack of subject matter jurisdiction only if: (1) 'the alleged claim under the

7  Constitution or federal statutes clearly appears to be immaterial and made solely for the

8  purpose of obtaining jurisdiction'; or (2) 'such a claim is wholly insubstantial and frivolous.'"

9  *Leeson v. Transamerica Disability Income Plan*, 671 F.3d 969, 975 (9th Cir. 2012).

10        The Court cannot say Plaintiffs' claims under the U.S. Constitution are frivolous or

11  made solely for the purpose of obtaining jurisdiction. *See Fight for Nevada v. Cegavske*,

12  Case No. 2:20-cv-00837-RFB-EJY, --- F.Supp.3d ----, 2020 WL 2614624, at *2 (D. Nev.

13  May 15, 2020) (applying the same test and rejecting a very similar jurisdictional argument

14  in a case where proponents of a campaign to recall Nevada's Governor challenged the

15  Secretary's decision not to grant them a deadline extension to collect signatures in light of

16  COVID-19).[8] As further discussed below, the Court finds them meritorious in part. In

17  addition, all parties rely on other federal court cases dealing with similar issues, and

18  several, if not all, of those courts found as-applied constitutional challenges to state

19  elections statutes similar to those Plaintiffs make here nonfrivolous. *See id.*; *see also*

20  *Thompson v. Dewine*, Case No. 2:20-CV-2129, 2020 WL 2557064 (S.D. Ohio May 19,

21  2020) (finding as-applied First Amendment challenge to Ohio statutes regulating the

22  process of amending Ohio's constitution similar to those at issue here meritorious);

23  *Esshaki v. Whitmer*, Case No. 2:20-CV-10831-TGB, 2020 WL 1910154 (E.D. Mich. Apr.

24  20, 2020) (same as to Michigan laws regulating the collection of signatures for political

25  candidacy), *motion for relief from judgment denied*, 2020 WL 1979126 (E.D. Mich. Apr.

26

27  _____

28      [8]The Court also notes the Secretary urged the Court to consider this decision in part because "the District of Nevada endeavors to maintain consistency and uniformity in the application of the law." (ECF No. 41 at 2.)

1    25, 2020); *Esshaki v. Whitmer [6th Cir.]*, Case No. 20-1336, 2020 WL 2185553, at *1 (6th

2    Cir. May 5, 2020) (affirming the *Esshaki* district court's likelihood of success on the merits

3    analysis); *but see Thompson v. Dewine [6th Cir.]*, Case No. 20-3526, --- F.3d ----, 2020

4    WL 2702483 (6th Cir. May 26, 2020) (staying the district court's injunction in *Thompson*,

5    but not dismissing the case for lack of subject-matter jurisdiction); *Arizonans for Fair*

6    *Elections v. Hobbs*, Case No. CV-20-00658-PHX-DWL, --- F.Supp.3d ----, 2020 WL

7    1905747, at *16 (D. Ariz. Apr. 17, 2020) (dismissing case similar to this one for lack of

8    standing and providing a rationale similar to the rationale Defendants provide here in their

9    subject-matter jurisdiction argument). The fact that other federal courts are currently

10   wrestling with constitutional issues similar to those presented by Plaintiffs in this case

11   constitutes further indicia that Plaintiffs' claims under the U.S. Constitution are not

12   frivolous.

13          In sum, the Court finds it has subject matter jurisdiction.[9]

14          **C.    'Under Color of Law'**

15          The Secretary and the Rural Defendants raised another threshold issue both in

16   their briefing and at the Hearing that is best conceptualized as an argument that the

17   Secretary's Denial Decision was not an action taken "under color of law" for purposes of

18   42 U.S.C. § 1983. (ECF Nos. 19 at 12-15, 24 at 14.) The Rural Defendants use the catchy

19   phrasing for this argument that a "virus cannot make an otherwise constitutional law

20   unconstitutional[.]" (ECF No. 19 at 12.) In gist, these defendants appear to raise a

21   threshold argument—that Plaintiffs' constitutional claims are noncognizable because

22   COVID-19 is the primary reason they have not been able to collect signatures, and

23   COVID-19 is not state action. (ECF Nos. 19 at 12-15, 24 at 14.)

24          The "'under color of law' requirement under § 1983 is the same as the Fourteenth

25   Amendment's 'state action' requirement." *Chudacoff v. Univ. Med. Ctr. of S. Nevada*, 649

26

27          [9]The Court will also deny the Secretary's motion to dismiss because the Court is
     rejecting this lack of subject matter jurisdiction argument—and this argument is the sole
28   basis for dismissal raised by the Secretary in her motion to dismiss. (ECF No. 25 at 9-10,
     14-15.)

1    F.3d 1143, 1149 (9th Cir. 2011) (citation omitted). And Plaintiffs use §1983 as the hook to

2    bring their First Amendment claims applied to Nevada through the Fourteenth Amendment

3    that are the focus of Plaintiffs' PI Motion. (*See generally* ECF Nos. 1, 2.) This is all to say

4    that the Court understands Defendants to have raised the threshold challenge that the

5    Secretary's Denial Decision was not made "under color of law" as required by § 1983. *See*

6    *West v. Atkins*, 487 U.S. 42, 48 (1988) ("To state a claim under § 1983, a plaintiff must

7    allege the violation of a right secured by the Constitution and laws of the United States,

8    and must show that the alleged deprivation was committed by a person acting under color

9    of state law.").

10          The parties crystallized their positions on this argument at the Hearing. Specifically,

11   the Secretary argued at the Hearing that her Denial Decision cannot constitute an action

12   taken under color of state law because the applicable state statutes gave her no discretion

13   to grant Plaintiffs' requested relief, and that her Denial Decision was "manufactured state

14   action" at best. However, the Secretary did not offer any caselaw to support the

15   propositions that: (1) perfect compliance with a state law giving a state official no discretion

16   to grant requested relief cannot be an action taken under color of state law for § 1983

17   purposes; or that (2) there is a difference between state action and manufactured state

18   action.

19          The Court was unable to locate any caselaw to support these two propositions in

20   its own research either—probably because none exists. As to the first proposition, the

21   Court finds the Secretary's argument unpersuasive. "The traditional definition of acting

22   under color of state law requires that the defendant in a § 1983 action have exercised

23   power 'possessed by virtue of state law and made possible only because the wrongdoer

24   is clothed with the authority of state law.'" *West*, 487 U.S. at 49 (citation omitted). And

25   "generally, a public employee acts under color of state law while acting in his official

26   capacity or while exercising his responsibilities pursuant to state law." *Id.* at 50. Here, there

27   is no real dispute as to whether the Secretary was acting in her official capacity when she

28

14

1   sent the letter denying Plaintiffs' request—she was—and even the Secretary argues that,

2   in sending that letter, she was exercising her responsibilities pursuant to state law.

3       Moreover, if an action taken by a state official prohibited by state law is still

4   considered under color of state law, then an action required by state law must be. *See*

5   *Wright and Miller*, Federal Practice and Procedure § 3573.2, *Section 1983 Actions—*

6   *Scope of Action: Elements of Claim, Remedies*, 13D Fed. Prac. & Proc. Juris. § 3573.2

7   (3d ed.) (footnote omitted) ("[A]n action can be under color of state law even though it has

8   not been authorized—and indeed is prohibited—by the state."). The treatise goes on to

9   state it is "rarely problematic" to determine if an action was taken under color of state law,

10  "when acts are taken by state or local officers exercising their authority or appearing to

11  exercise their authority." *Id.* And that is the case here. *See, e.g.*, NRS § 293.124 ("[T]he

12  Secretary of State is responsible for the execution and enforcement of the provisions of

13  title 24 of NRS and all other provisions of state and federal law relating to elections in this

14  State."). Thus, the Court finds that the Secretary's responsive letter denying Plaintiffs'

15  request (ECF No. 1-26) constitutes an action taken under color of state law as required by

16  § 1983.

17      As to the second proposition, the Court is unpersuaded there is any meaningful

18  distinction between 'state action' and 'manufactured state action.' To the extent the

19  Secretary was trying to argue the Secretary did not act under color of state law here

20  because she responded to a letter from Plaintiffs, instead of writing the initial letter, the

21  Court was also unable to locate any legal support for that being a meaningful distinction.

22      **D.    Failure to Join a Necessary Party**

23      Defendants and Intervenor-Defendants also argued at the Hearing that Plaintiffs

24  should have sent their requests for an extension of the Deadline and a waiver of the In-

15

1   Person Requirements to the Governor instead of the Secretary, and should have joined

2   the Governor as a Defendant in this lawsuit.[10]

3       There are two aspects to Defendants and Intervenor-Defendants' argument as

4   presented at the Hearing. First, they argued the Governor of Nevada is a necessary party

5   because Plaintiffs assert they were unable to collect signatures because of the Stay at

6   Home Order and related orders, so Plaintiffs should be challenging the Stay at Home

7   order. Plaintiffs responded they were not challenging the Stay at Home order or related

8   orders, and even agreed those orders were prudent in terms of protecting public health.

9   Second, Defendants and Intervenor-Defendants argued Plaintiffs should have sued the

10  Governor because the plaintiffs in *Esshaki* and *Thompson* did. Plaintiffs responded that

11  they were not required to sue the Governor merely because the plaintiffs did in those other

12  cases, and instead pointed to Nevada law putting the Secretary squarely in charge of

13  elections, reiterated that they were only challenging the Secretary's Denial Decision,

14  explained the Secretary would be the person tasked with granting them the relief they

15  sought in any event, and made the practical argument that if the Court were to dismiss

16  this case for failure to join the Governor, Plaintiffs would immediately name him in an

17  amended complaint, and the parties would be back before the Court.

18      The Court finds Plaintiffs' arguments more persuasive, and more in line with Rule

19  12(b)(7). That rule requires the Court look to Rule 19, which provides that a necessary

20  party is one who is necessary for the Court to accord complete relief between the parties,

21  claims an interest in the relief sought by the parties, or who is situated such that not joining

22  them would substantially impair their or an existing party's interest. *See* Fed. R. Civ. P.

23  19(a)(1). As Plaintiffs argue, the Governor does not fit those criteria. And as Plaintiffs also

24  argued at the Hearing, because the Secretary is the filing officer for constitutional

25  amendments under Nevada's constitution, Nev. Const. art. XIX, § 2, and is tasked with

26

27      [10]The Court addresses this argument as a threshold issue because it can be
    construed as an argument for dismissal for failure to join a necessary party under Federal
28  Rule of Civil Procedure 12(b)(7). *See* Fed. R. Civ. P. 12(b)(7) (providing that a defendant
    may assert the defense of "failure to join a party under Rule 19" by motion).

1   executing all elections laws in Nevada, NRS § 293.124—and the Rural County Defendants

2   are the parties who help administer the election in each county—the parties necessary to

3   accord Plaintiffs the complete relief they seek here are already before the Court. Moreover,

4   the Court does not see how declining to force joinder of the Governor would impair any

5   party's interest, and neither Defendants nor Intervenor-Defendants articulated any such

6   impairment at the Hearing. In sum, the Court is unpersuaded it should dismiss this case

7   for failure to join a necessary party.[11]

8   Having addressed all of the threshold issues raised by Defendants and Intervenor-

9   Defendants, the Court will move on to the merits of Plaintiffs' PI Motion.

10   **E.   The Merits of Plaintiffs' PI Motion**

11   Plaintiffs assert an as-applied challenge to the constitutionality of the statutes

12   providing the Deadline and the In-Person Requirements. (ECF No. 35 at 7-9; ECF No. 1

13   at 29.) They  argue the Secretary's decision not to extend the Deadline and construe the

14   In-Person Requirements differently than she did violated their First Amendment rights

15   under the factual circumstances created by the combination of the COVID-19 pandemic

16

17   _____

18   [11]The Court assumes without deciding the Governor could have issued an
executive order that would effectively grant Plaintiffs the relief they seek here, as
evidenced by Plaintiffs' proffer of an executive order promulgated by the Governor of

19   Colorado extending a deadline similar to the Deadline, and waiving requirements similar
to the In-Person Requirements. (ECF Nos. 35 at 3, 35-1; *see also* ECF No. 24 at 8 n.1

20   ("While the Governor has emergency powers pursuant to NRS Chapter 411, which
arguably includes the power to modify statutory deadlines under appropriate

21   circumstances, the Governor is not a party to this case.").) It is not clear why Plaintiffs did
not ask for exemptions from the Governor. However, that is of no moment. The Court's

22   role is simply to say what the law is when asked. *See Marbury v. Madison*, 5 U.S. 137,
177 (1803) ("It is emphatically the province and duty of the judicial department to say what

23   the law is."). "So if a law be in opposition to the constitution; if both the law and the
constitution apply to a particular case, so that the court must either decide that case

24   conformably to the law, disregarding the constitution; or conformably to the constitution,
disregarding the law; the court must determine which of these conflicting rules governs

25   the case." *Id.* at 178. This is basically the situation Plaintiffs have presented to the Court
to resolve—they claim to have identified a conflict between Nevada's laws and the U.S.

26   Constitution as applied to them during the COVID-19 pandemic. It is the Court's job to
determine which of the conflicting rules proffered by the parties governs the outcome of

27   this case. Indeed, "[t]his is of the very essence of judicial duty." *Id.* The Court will therefore
not take a threshold exit ramp and instead put its foot down, heading straight for the

28   collision between Nevada law and the U.S. Constitution Plaintiffs claim to have discovered.

and the Stay at Home Order—because her decision makes it impossible for their Initiative to appear on the November ballot. (*Id.* at 2-3.) Having framed Plaintiffs' core argument, the Court will first address their likelihood of success on the merits and whether they have suffered irreparable harm together, and then address the public interest and balancing of the equities prongs together. *See Winter*, 555 U.S. at 20 (providing these are the four factors the court must consider in deciding whether to grant the PI Motion).

### 1. Likelihood of Success on the Merits and Irreparable Harm

Defendants dispute the framework that applies to the Court's analysis, and proffer different government interests in support of the Secretary's decision to strictly construe the statutes providing for the Deadline and the In-Person Requirements. (*See, e.g.*, ECF No. 24 at 10-20.) Thus, to evaluate Plaintiffs' likelihood of success on the merits, the Court will first address the applicable framework, and then the parties' arguments as to the Deadline and the In-Person Requirements.[12]

---

[12]As mentioned above during the under color of law discussion, Defendants, but especially the Rural County Defendants, argue that Plaintiffs are unlikely to succeed on the merits because "[a] virus cannot make an otherwise constitutional law unconstitutional." (ECF No. 19 at 12.) But that argument appears merely to misunderstand that Plaintiffs are bringing an as-applied constitutional challenge to the Nevada statutes that provide the Deadline and the In-Person requirements. As Plaintiffs argue in reply, "that the application of the statute at issue may have been upheld previously under different circumstances does not resolve the question of their constitutionality here—as applied during the midst of a historical pandemic." (ECF No. 35 at 7-8 (*citing Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011) (noting that "[a] paradigmatic as-applied attack . . . challenges only one of the rules in a statute, a subset of the statute's applications, or the application of the statute to a specific factual circumstance, under the assumption that a court can 'separate valid from invalid subrules or application.'")) (citation omitted).) The Court is convinced it must consider the constitutionality of the applicable statutes as applied to Plaintiffs during the COVID-19 pandemic. As Plaintiffs have articulated their challenge here, COVID-19 and the Stay at Home Order constitute the factual circumstances under which the Secretary denied Plaintiffs' request. Thus, the Court rejects the Rural County Defendants' argument as either a misstatement of the law, or reflecting a misunderstanding of Plaintiffs' theory of their case—and will not further address it as to Plaintiffs' likelihood of success on the merits. *But see Thompson [6th Cir.]*, 2020 WL 2702483, at *1, *4 (contradictorily stating that "[o]ur Constitution, of course, governs during both good and challenging times[,]" but then going on to state: "Moreover, just because procuring signatures is now harder (largely because of a disease beyond the control of the State) doesn't mean that Plaintiffs are *excluded* from the ballot. And we must remember, First Amendment violations require state action.").

### a.   Framework

The parties understandably dispute the framework that applies to the Court's likelihood of success on the merits analysis because Plaintiffs' proffered framework and corresponding burdens make it easier for them to show they are likely to prevail on the merits than Defendants and Intervenor-Defendants' proffered frameworks would. (ECF Nos. 15-3 at 7-10, 19 at 10-15, 24 at 10-13, 35 at 3-6.) However, all parties discuss *Angle v. Miller*, 673 F.3d 1122 (9th Cir. 2012), and seem to agree that case provides the framework here. (ECF Nos. 15-3 at 17-10, 19 at 10-15, 24 at 10-13, 35 at 3-6.) The Court also agrees that *Angle* provides the applicable framework.

In *Angle*, the Ninth Circuit took what is basically the *Anderson-Burdick* framework and applied it to the specific context of Nevada's initiative process for amending the Nevada Constitution. However, while this case challenges the Deadline and In-Person Requirements created by statutes that effectively implement, and add to, the initiative process provided for in the Nevada Constitution, *Angle* addressed a facial constitutional challenge (under the U.S. Constitution) to the so-called "All-Districts Rule" embedded in the Nevada Constitution itself. *See* 673 F.3d at 1126-27. While not directly on point, *Angle* nonetheless provides the best framework for evaluating the constitutionality of the Deadline and In Person Requirements because it speaks directly to the application of the First Amendment to Nevada's process for amending Nevada's constitution through ballot initiatives. *Angle* is therefore more directly applicable to this case than the more general *Anderson-Burdick* framework. This is in part because—as the Secretary points out—this case is not exactly about voting rights, but rather the "process for qualifying an initiative proposal to appear on the ballot before anyone could cast a vote." (ECF No. 24 at 3.) *See also Angle*, 673 F.3d at 1130 ("Votes and petition signatures are similar in some respects, . . . but ballot access requirements and elections serve different purposes.") (internal citations omitted).

However, *Angle* is confusing. While the Ninth Circuit stated in *Angle* "[t]here is no First Amendment right to place an initiative on the ballot[,]" *Id.* at 1133, it went on to

1    characterize the right to circulate initiative petitions as "core political speech" and explain

2    that there were two scenarios in which even nondiscriminatory ballot-access provisions

3    could violate the First Amendment rights of their proponents. *Id.* Regardless, and as most

4    pertinent here, the Ninth Circuit wrote:

5        "as applied to the initiative process, we assume that ballot access restrictions place
         a severe burden on core political speech, and trigger strict scrutiny, when they
6        significantly inhibit the ability of initiative proponents to place initiatives on the ballot.
         This is similar to the standard we apply to ballot access restrictions regulating
7        candidates. In that setting, we have held that 'the burden on plaintiffs' rights should
         be measured by whether, in light of the entire statutory scheme regulating ballot
8        access, 'reasonably diligent' candidates can normally gain a place on the ballot, or
         whether they will rarely succeed in doing so.'"

9

10   *Id.* (citation omitted). Thus, the Ninth Circuit in *Angle* laid out a test for when to apply strict

11   scrutiny to restrictions on Nevada ballot initiatives proposing constitutional amendments,

12   like those at issue here. *Angle* requires application of strict scrutiny when: (1) the

13   proponents of the initiative have been "reasonably diligent" as compared to other initiative

14   proponents; and (2) when the restrictions significantly inhibit the proponents' ability to

15   place an initiative on the ballot. *See id.*[13] The Court will address each requirement in turn.

16                                *i.    Reasonable Diligence*

17        Relying particularly on the declaration of Laura Hale attached to their reply brief,

18   Plaintiffs argue they have been reasonably diligent in collecting signatures in support of

19   their Initiative. (ECF No. 35 at 17.) Moreover, Plaintiffs argued at the Hearing they had

20   been reasonably diligent especially considering that much of their delay in collecting

21   signatures before the onset of COVID-19 in Nevada is attributable to being held up in

22   state-court litigation initiated by Intervenor-Defendants.

23        Intervenor-Defendants responded in pertinent part at the Hearing that Plaintiffs had

24   not been reasonably diligent. Intervenor-Defendants specifically argued there is no way of

25

26        ─────────────
         [13]In *Angle*, the Ninth Circuit found that strict scrutiny did not apply to the All Districts
27   Rule, and the All Districts Rule did not violate the plaintiffs' First Amendment rights
     because the state had shown the All Districts Rule furthered "an important regulatory
     interest[,]" namely, "in making sure that an initiative has sufficient grass roots support to
28   be placed on the ballot." 673 F.3d at 1134-35.

1   knowing whether Plaintiffs would have gathered the required number of signatures by the

2   Deadline under normal circumstances, but it is unlikely they would have because they only

3   collected 10,000 signatures in two months, which is well short of the approximately 97,000

4   required, especially when accounting for the fact that some of the signatures will be

5   rejected upon verification by the county clerks. Intervenor-Defendants also pointed out

6   that Plaintiffs stopped collecting signatures in early March—before the Stay-at-Home

7   order went into effect. Further, Intervenor-Defendants noted that Plaintiffs did not attempt

8   to collect any signatures after the Stay-at-Home order went into effect, making this case

9   distinguishable from *Esshaki*, 2020 WL 1910154, at *5, where the plaintiff explained he

10  tried gathering signatures by mail while a stay home order was in effect, but found it

11  prohibitively expensive. Finally, Intervenor-Defendants directed the Court's attention to the

12  District of Arizona's finding of a lack of diligence on the plaintiffs' part in *Hobbs*, 2020 WL

13  1905747, which they argued is the most analogous, though merely persuasive, district

14  court case any of the parties have presented here. Neither Plaintiffs, Defendants, nor

15  Intervenor-Defendants presented any argument or evidence about the diligence of the

16  proponents of the other initiative proposing a constitutional amendment that may appear

17  on the November ballot,[14] which could have been useful as a comparator.

18      Overall, the Court finds Plaintiffs have been reasonably diligent in attempting to

19  collect signatures given the circumstances. First, the Court credits Ms. Hale's explanation

20  that Fair Maps did not begin collecting signatures until January 7, 2020, because the first

21  version of the initiative was almost immediately held up in litigation after Fair Maps filed it

22  on November 4, 2019, and any signatures collected in support of that defective first petition

23  could not be used to support the petition. (ECF No. 35-2 at 4.) Thus, Fair Maps began

24  collecting signatures as soon as it filed an amended petition on January 7, 2020, despite

25  continued legal risk from Intervenor-Defendants' state court challenge. (*Id.* at 4-5.) Under

26  the reasonableness standard that applies here, Plaintiffs started collecting signatures as

27

28      [14]The Secretary states there is one other initiative petition campaign to amend
    Nevada's constitution this election season. (ECF No. 24 at 13 n. 2.)

soon as it made sense to do so. That also distinguishes this case from *Hobbs*, where the court found the plaintiffs were not diligent as pertinent to its likelihood of success on the merits analysis primarily because they waited a long time before beginning to collect signatures. *See Hobbs*, 2020 WL 1905747, at *10 ("Plaintiffs could have begun organizing and gathering signatures in November 2018 (as at least one other initiative committee did) yet didn't file the necessary registration paperwork with the Secretary until August 20, 2019 (HRAZ) and October 30, 2019 (AFE), thereby wasting between 45% and 55% of the 20-month election cycle."). Thus, the Court finds Plaintiffs were reasonably diligent in terms of when they started collecting signatures.

Second, the Court does not find the fact Plaintiffs stopped collecting signatures in early March—after the COVID-19 outbreak started in Nevada, but before the Stay at Home Order went into effect—weighs against finding diligence here. Forcing circulators to go out to collect signatures during the COVID-19 pandemic is unreasonable and unwise. *See Esshaki*, 2020 WL 1910154, at *5 ("prudence at that time counseled in favor of doing just the opposite.").[15] Similarly, the Court does not give Intervenor-Defendants' argument that Plaintiffs should have presented evidence about how they continued to try collect signatures once the Stay at Home Order went into effect much credence because the Stay at Home Order did not permit circulators to be out collecting signatures. (ECF No. 1-13 at 3-4.) That makes this case distinguishable from *Thompson [6th Cir.]*, where Ohio's equivalent orders included a specific carve-out for protected First Amendment activity. *See* 2020 WL 2702483, at *3. The Court does not fault Plaintiffs for ceasing to try to collect

---

[15] *Esshaki* is merely persuasive, as are many of the decisions discussed in this order. That is because the caselaw appears to be rapidly evolving on these issues, but mostly outside the Ninth Circuit—*Hobbs*, from the District of Arizona, being the exception. Thus, and at the urging of the parties, the Court is looking outside the Ninth Circuit to see how other courts are handling these issues.

The Court clarifies one other point. The Court still considers *Esshaki* persuasive, even though it deals with individual candidates trying to qualify themselves for the ballot rather than an initiative petition to amend a state constitution like the petition at issue here, because the Ninth Circuit stated in *Angle* that courts could look to cases on ballot-access restrictions regulating candidates in cases involving ballot-access restrictions on initiatives to amend Nevada's constitution, like those at issue here. *See* 673 F.3d at 1133.

1   signatures once the COVID-19 outbreak started, and especially not once the Stay at Home

2   Order prohibited circulators from collecting signatures.

3       Third, Plaintiffs' evidence shows they were still working towards getting their

4   Initiative on the November ballot even after they stopped trying to collect signatures. (ECF

5   No. 35-2 at 5 (explaining they kept working and were ready to hire a professional

6   consultant by early April 2020).) Thus, Intervenor-Defendants' argument that Plaintiffs

7   have not been diligent because they stopped working on their Initiative once COVID-19

8   spread to Nevada is not bourne out by the limited evidence before the Court. (*Id.*)

9       Fourth, the fact that Plaintiffs collected 10,000 signatures using only word-of-mouth

10  between January 7 and early March 2020 also weighs slightly in favor of finding they have

11  been reasonably diligent. (*Id.*) To be sure, 10,000 is a lot less than 97,000, as Intervenor-

12  Defendants argue. But if the Court accepts Ms. Hale's explanation that collecting those

13  10,000 signatures showed the Plaintiffs were in a good position to collect the required

14  number of signatures by the Deadline under normal circumstances, 10,000 looks like a

15  more substantial number. (*Id.*) That said, the Court finds this fact only weighs slightly in

16  favor of showing diligence because in absolute terms, Plaintiffs had many more signatures

17  to collect as of early March to hit 97,000 by the Deadline. *See Esshaki*, 2020 WL 1910154,

18  at *11 (finding the plaintiff diligent where he had "already obtained seventy percent" of the

19  required number of signatures, a much higher percentage than Plaintiffs assert they have

20  obtained here).

21      Fifth, and finally, the fact that Plaintiffs did not present evidence about the number

22  of signatures collected by the proponents of the other ballot initiative campaign currently

23  attempting to amend the Nevada Constitution (*see* ECF No. 24 at 13 n. 2) weighs slightly

24  against finding Plaintiffs diligent here, because that could have given the Court a

25  comparative picture of what a reasonably diligent campaign looked like given the current

26  circumstances. *See Angle*, 673 F.3d at 1133 (directing district courts to compare to

27  reasonably diligent campaigns). But even lacking such comparative evidence, Plaintiffs'

28  proffer as to their reasonable diligence is sufficient. The Court therefore finds that Plaintiffs

1    have been reasonably diligent in attempting to gather signatures, such that it will move on

2    to the next step of the *Angle* analysis.

3                                            *ii.    Significantly Inhibit*

4                Plaintiffs' argument as to this prong is simple. Fair Maps will not get its Initiative on

5    the November ballot without an extension of the Deadline and/or a waiver of the In-Person

6    Requirements because it has not collected enough signatures. (ECF No. 35 at 5.) Thus,

7    the Secretary's strict interpretation of the challenged statutes significantly inhibits their

8    ability to get their Initiative on the November 2020 ballot. The Court finds this argument

9    persuasive because it has already rejected Intervenor-Defendants and Defendants'

10   threshold arguments. Those arguments in gist contend that the Secretary's denial of the

11   Plaintiffs' requests in reliance on the lack of discretion afforded by the Nevada statutes

12   providing the Deadline and the In-Person Requirements did not significantly inhibit the

13   proponents' ability to place an initiative on the ballot—either COVID-19, the Stay at Home

14   Order, or Plaintiffs' lack of diligence did. But as explained *supra* in Sections IV(A)-(C) and

15   (E)(1)(a)(i), the Court finds those arguments unpersuasive.

16               As a matter of common sense, COVID-19, the Stay at Home Order, and the

17   Secretary's Denial Decision all significantly inhibit Plaintiffs' ability to get their Initiative on

18   the November 2020 ballot. However, Plaintiffs challenge only the Secretary's denial here.

19   Moreover, as Plaintiffs have phrased their as-applied First Amendment challenge, COVID-

20   19 and the Stay at Home Order constitute factual circumstances illustrating how the

21   Secretary's Denial Decision makes it essentially impossible for them to get their Initiative

22   on the ballot under the circumstances. The Court is thus persuaded that the Secretary's

23   Denial Decision significantly inhibits Plaintiffs' ability to get their Initiative on the ballot as

24   that phrase is used in *Angle*. In addition, only the Secretary's Denial Decision is

25   redressable here. The Court cannot consider modifying the Stay at Home Order in this

26   case because Plaintiffs did not sue the Governor, and do not ask the Court to modify it.

27   And of course, the Court cannot stop COVID-19. Thus, again as explained *supra*, the

28   Secretary's Denial Decision is the only justiciable burden the Court can consider here. The

                                                    24

1  Secretary's Denial Decision significantly inhibited Plaintiffs' chances of collecting the

2  threshold signatures to qualify their Initiative.

3      Having found that Plaintiffs satisfy the 'reasonable diligence' and 'significantly

4  inhibit' prongs of the *Angle* test, the Court will apply strict scrutiny to the Nevada statutes

5  providing the Deadline and the In-Person Requirements. *See* 673 F.3d at 1133 (creating

6  hypothetical space for the application of strict scrutiny here). The Nevada statutes

7  providing the Deadline and the In-Person Requirements must therefore be "narrowly

8  tailored and advance a compelling state interest" to survive First Amendment scrutiny. *Id.*

9  at 1132 (citing *Prete v. Bradbury*, 438 F.3d 949, 961 (9th Cir. 2006)).

10     The Court will address the Deadline and the In-Person Requirements separately

11 below because (as mentioned *infra*) Defendants and Intervenor-Defendants assert

12 different state interests that justify the different requirements, and the parties' arguments

13 as to the practical details of Plaintiffs' requested relief differ depending on the challenged

14 requirement—which goes to whether the restrictions are narrowly tailored.

15     But the Court first pauses to recognize the significant tension between the legal

16 principles the parties argue govern the Court's analysis here. Plaintiffs have some First

17 Amendment right to circulate their Initiative petition. *See Angle*, 673 F.3d at 1132-33. And

18 federal constitutional rights override state statutes. *See, e.g.*, *Ex parte Young*, 209 U.S.

19 123, 159 (1908). But the Court telling the Secretary precisely how she must administer the

20 initiative-petition process this election season "would raise significant separation of powers

21 and federalism concerns[,]" *Hobbs*, 2020 WL 1905747, at *3, and potentially violate the

22 *Purcell* principle.[16] Moreover, the mandatory injunction that Plaintiffs seek here—

23 affirmatively ordering the Secretary to do things—is untenable because "federal courts

24

25 _____

26 [16]*Purcell v. Gonzalez*, 549 U.S. 1 (2006). *See also Republican Nat'l Comm. v. Democratic Nat'l Comm.* ("*RNC*"), 140 S. Ct. 1205, 1207 (2020) ("This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election.) (citing *Purcell*, 549 U.S. 1). Thus, the *Purcell* principle provides that federal courts should not alter state election rules close to an election.

28

25

1   have no authority to dictate to the States precisely how they should conduct their

2   elections." *Esshaki [6th Cir.]*, 2020 WL 2185553, at \*2; *see also Thompson [6th Cir.]*, 2020

3   WL 2702483, at \*5 ("we note that the district court exceeded its authority by rewriting Ohio

4   law with its injunction."). To some extent, these tensions are irreconcilable. But the Court

5   will do its best to walk the fine line between these competing considerations.

### b.   Deadline

7       Plaintiffs argue that NRS § 295.056(3) (which provides the Deadline) is not narrowly

8   tailored because extending the Deadline by six weeks—roughly the period the Stay at

9   Home Order was fully in effect—would not even push back the deadline to the deadline

10  required by Nevada's constitution, and while pushing back the Deadline would certainly

11  make the Secretary and the county clerks' jobs more difficult, it would not make them

12  impossible. (ECF No. 35 at 7, 11-13.) The Secretary argues granting Plaintiffs an

13  extension would give Defendants only "minimum opportunity for normal verification to

14  ensure that ballot initiatives changing Nevada's constitution would be accurate and free

15  from fraud[.]" (ECF No. 24 at 19-20.) The Secretary elsewhere argues granting Plaintiffs

16  an extension would make it more difficult for Defendants to prepare for the November

17  2020 general election, a sentiment echoed by the Rural County Defendants at the Hearing.

18  But the Court agrees with Plaintiffs.

19      The Court finds that NRS § 295.056(3) is neither narrowly tailored, nor does it

20  advance a compelling governmental interest under the circumstances—and is therefore

21  unconstitutional as the Secretary applied it to Plaintiffs in denying their request for an

22  extension of the Deadline in her letter (ECF No. 1-26). To start, Plaintiffs have some sort[17]

23  of First Amendment right to circulate their Initiative petition. *See Angle*, 673 F.3d at 1133.[18]

---

25      [17]As discussed *infra*, *Angle* is confusing.

26      [18]That distinguishes this case from Judge Boulware's decision in *Fight for Nevada*,
27  which was explicitly premised on his finding that "the Ninth Circuit has never recognized a
    First Amendment right to file a recall petition." 2020 WL 2614624, at \*5. This case is about
    a slightly different First Amendment right—the right to place an initiative on the ballot. And
28  while Judge Boulware mentioned in *Fight for Nevada* (*see id.*) that the Ninth Circuit stated

1
2
3

Next, the Deadline in NRS § 295.056(3) is not required by the Nevada constitution, but merely permitted by it. *See* Nev. Const. art. XIX, § 2(4) (providing that the deadline is 90 days before the general election).

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Defendants basically argue that they will be severely inconvenienced if Plaintiffs get any extension of the Deadline. While this is a valid governmental interest, the Court does not find it compelling under the circumstances here—during an unprecedented pandemic. As Plaintiffs have no chance of getting their Initiative on the ballot without an extension, their First Amendment rights have been violated by the Secretary's denial of their request for an extension. *See Angle*, 673 F.3d at 1133 (stating that ballot access restrictions can indirectly burden the core political speech of circulating initiative petitions where they make it less likely an initiative will qualify for a ballot). That constitutional harm outweighs Defendants' proffered interest of severe inconvenience. And that is especially the case for the time period (approximately six weeks) that the Stay at Home Order was in effect. Plaintiffs were prohibited from collecting signatures during that time, so it is both unreasonable and unfair not to extend a statutory deadline for a corresponding period of time.[19] (ECF No. 1-13 at 3-4.) If there is any time where business as usual is impossible, this is it. Thus, the Court does not find severe inconvenience a compelling government interest given these extraordinary circumstances. And to the extent Defendants argue fraud prevention is the interest weighing in favor of maintaining the Deadline during the COVID-19 pandemic, none of them explained how having the amount of time they

23
24
25

in *Angle* there is "no First Amendment right to place an initiative on the ballot[,]" as explained *infra*, the Ninth Circuit went on to outline a scenario where a regulation regarding ballot access for initiative petitions to amend Nevada's constitution could violate the First Amendment. *See Angle*, 673 F.3d at 1133. As explained *supra*, the Court finds this is such a scenario, at least as to the Deadline.

26
27
28

[19]As mentioned *infra*, this fact distinguishes this case from *Thompson [6th Cir.]*, where the Sixth Circuit highlighted how Ohio's stay home orders contained a First Amendment carve-out. *See* 2020 WL 2702483, at *3. This fact also makes this case more like *Esshaki [6th Cir.]*. *See* 2020 WL 2185553, at *1 (affirming the district court's application of strict scrutiny, and finding that strict enforcement of election regulations like the Deadline was unconstitutional under the circumstances).

1    normally have to review initiative petition signatures will substantially contribute to fraud-

2    reduction efforts.

3         Moreover, NRS § 295.056(3) is not narrowly tailored. As noted, the Deadline it

4    imposes is not required by Nevada's constitution. Whether the Deadline is narrowly

5    tailored therefore depends on whether you accept Defendants' argument they need as

6    much time as they normally have. But as Plaintiffs point out, the Secretary does not even

7    appear to really believe that. (ECF No. 35 at 11-12.) Indeed, the Secretary merely argues

8    she and the county clerks will have less time if required to grant an extension. (ECF No.

9    24 at 20.) And there is no dispute about that—extending the deadline will give Defendants

10   less time. But that does not establish Defendants will not have enough time to properly do

11   their job. Moreover, the Court finds Plaintiffs' analysis of the timeline proffered by the

12   Secretary—and Plaintiffs' related argument that there will be enough time even if Plaintiffs

13   get an extension—more persuasive than the counterarguments offered by Defendants

14   and Intervenor-Defendants. (ECF No. 35 at 12-13.) There does appear to be enough time

15   to do everything Defendants would normally do on an expedited timeline. Thus, because

16   the Court finds Defendants could accomplish what they normally do as pertinent here in

17   less time than they normally have, NRS § 295.056(3) is not narrowly tailored.

18        Because NRS § 295.056(3) is neither narrowly tailored, nor does it serve a

19   compelling government interest under the circumstances, it violates Plaintiffs' First

20   Amendment political speech rights as the Secretary applied it to Plaintiffs in her Denial

21   Decision (ECF No. 1-26).[20] *See Esshaki [6th Cir.]*, 2020 WL 2185553, at *1 (affirming a

22   similar result as to a similar restriction).

23

24        [20]As the Court stated during the Hearing, the Court assumes without deciding the
     result of this finding is the deadline will revert to the constitutional deadline. Mindful of the
25   rationale expressed by the Sixth Circuit in *Esshaki [6th Cir.]*, 2020 WL 2185553, at *2, and
     *Thompson [6th Cir.]*, 2020 WL 2702483, at *5, the Court will go no further, such as by
26   explicitly extending the Deadline to a particular date. Either the constitutional deadline
     applies, (*see* Nev. Const. art. XIX, § 2(4)), or the parties can work out a reasonable
27   accommodation. If it were up to the Court, an extension corresponding to the precise
     length of time the Stay at Home Order was in effect seems the most reasonable.
28

1

### c.   In-Person Requirements

2    However, the Court's analysis as to the In-Person Requirements differs from its

3    analysis as to the Deadline. This is for two main reasons. First, Defendants and Intervenor-

4    Defendants' proffered governmental interest of preventing fraud is more clearly articulated

5    and better supported as to the In-Person Requirements. Second, the relief Plaintiffs seek

6    as to the In-Person Requirements generally requires the Court to get impermissibly in the

7    weeds of designing election procedures because Plaintiffs ask the Court to order the

8    Secretary to set up a system for collecting and verifying signatures offered to support an

9    initiative petition electronically, for the first time, immediately. (ECF No. 35 at 10-11

10   (proposing some ideas as to how electronic signature verification could work).) Thus,

11   before even getting to the strict scrutiny analysis, the Court notes that the *Purcell* principle

12   counsels against the Court intervening at all when it comes to the In-Person

13   Requirements. (ECF Nos. 15-3 at 6, 19 at 17-18 (making this argument).)

14   With the *Purcell* principle, the Supreme Court "has repeatedly emphasized that

15   lower federal courts should ordinarily not alter the election rules on the eve of an election."

16   *RNC*, 140 S. Ct. at 1207; *see also Republican Party of Pa. v. Cortés*, 218 F. Supp. 3d 396,

17   405 (E.D. Pa. 2016) ("Federal intervention at this late hour risks 'a disruption in the state

18   electoral process [which] is not to be taken lightly.' 'This important equitable consideration

19   goes to the heart of our notions of federalism.'") (alteration in original) (citation and

20   quotation omitted). This principle is particularly pertinent where plaintiffs ask courts to

21   "impose large-scale changes to the election process." *Bryan v. Fawkes*, 61 V.I. 416, 469

22   (V.I. 2014) (collecting cases).

23

24

---

25   The Court also notes this finding does not necessarily mean Plaintiffs will collect a
     sufficient number of signatures to get their Initiative on the ballot—they will just have some

26   more time to try.

27   Finally, primarily for the reasons explained *infra* in Sections IV(A)-(D), the Court
     finds it does not matter whether NRS § 295.056(3) gave the Secretary any discretion to

28   give Plaintiffs an extension. In any event, there can be no reasonable dispute that the
     Court can declare a state statute unconstitutional as-applied, as it has done here.

1       Even though there are some five months until the election, rolling out and testing a

2   new electronic system for signature collection and verification between now and then will

3   take some time. Thus, the Court finds the *Purcell* principle applies to the In-Person

4   Requirements despite Plaintiffs' argument there is still plenty of time before the election.

5   (ECF No. 35 at 19-20.) *See also Paher v. Cegavske* ("*Paher II*"), Case No. 3:20-cv-00243-

6   MMD-WGC, 2020 WL 2748301, at *6 (D. Nev. May 27, 2020) (denying second request for

7   a preliminary injunction in part based on the *Purcell* principle).

8       Alternatively, the Court finds the statutes providing the In-Person Requirements

9   (NRS § 295.0575(1), (5)) survive strict scrutiny because they are narrowly tailored to

10  achieve their compelling government interest of preventing fraud. As the Secretary argues

11  (ECF No. 24 at 16), the Nevada Supreme Court has previously held that "according to the

12  statute's legislative history, the affidavit requirement, among other amendments passed

13  by the 2007 Legislature, was primarily intended to prevent fraud in the signature-gathering

14  process." *Las Vegas Convention & Visitors Auth. v. Miller*, 191 P.3d 1138, 1154 (Nev.

15  2008). And preventing fraud in elections is generally considered an "important interest."

16  *See, e.g.*, *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 205 (1999).

17      Further, the In-Person requirements make clear their approach to preventing fraud

18  is to ensure people sign initiative petitions in-person, and do not appear to allow for

19  electronic signatures. *See* NRS § 295.0575(1), (5). While there may be other ways to

20  prevent fraud in signature collection, the In-Person Requirements are certainly one way to

21  accomplish that goal, and no party before the Court questions the effectiveness of the In-

22  Person Requirements. Thus, the In-Person Requirements are narrowly tailored to serve

23  the compelling government interest of preventing fraud, and thus survive strict scrutiny

24  even under the circumstances presented by the combination of the COVID-19 pandemic

25  and the Stay at Home Order.

26      The Court therefore concludes Plaintiffs are likely to succeed on the merits of their

27  claim that the Secretary's refusal to extend the Deadline violated their First Amendment

28

30

1  rights as applied to these factual circumstances, but not their challenge to the In-Person

2  Requirements.

3  **d.      Irreparable Harm**

4  Because the Court concludes Plaintiffs are likely to succeed on the merits that the

5  Secretary's decision not to extend the Deadline violated their First Amendment rights, the

6  Court also necessarily finds irreparable harm. *See Sanchez v. Cegavske*, 214 F. Supp.

7  3d 961, 976 (D. Nev. 2016) (first citing *Cardona v. Oakland Unified Sch. Dist., California*,

8  785 F. Supp. 837, 840 (N.D. Cal. 1992) ("Abridgement or dilution of a right so fundamental

9  as the right to vote constitutes irreparable injury."), and then citing *Melendres v. Arpaio*,

10  695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of

11  constitutional rights 'unquestionably constitutes irreparable injury.'")); *see also Angle*, 673

12  F.3d at 1132 (stating that restrictions on ballot initiatives can violate the First Amendment

13  where they make it "less likely that proponents will be able to garner the signatures

14  necessary to place an initiative on the ballot"). Moreover, as a matter of common sense,

15  Plaintiffs will not be able to get their Initiative on the ballot in November without an

16  extension. And they may not even with an extension. But because they certainly will not

17  get their Initiative on the ballot without an extension, they would be irreparably harmed if

18  the Court did not issue a preliminary injunction here.

19  **2.      Balancing of the Equities and the Public Interest**

20  The Court also considers these factors together. "When the government is a party,

21  these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th

22  Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "To determine which way the

23  balance of the hardships tips, a court must identify the possible harm caused by the

24  preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of

25  Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). The Court must

26  then weigh "the hardships of each party against one another." *Id.* As to public interest, "[i]n

27  exercising their sound discretion, courts of equity should pay particular regard for the

31

1   public consequences in employing the extraordinary remedy of injunction." *Winter*, 555

2   U.S. at 24.

3          These two factors also weigh in favor of issuing a preliminary injunction that only

4   declares NRS § 295.056(3) unconstitutional as applied to Plaintiffs by the Secretary under

5   the unique factual circumstances of this case. On the one hand, Plaintiffs will be harmed

6   if an injunction does not issue because the Secretary violated their First Amendment

7   rights, and they will have no chance of getting their Initiative on the November 2020 ballot

8   if they have to submit all of their signatures by the Deadline. The Court also found Plaintiffs

9   will be irreparably harmed. On the other hand, Defendants will be harmed if an injunction

10  does issue because they will have to do the same amount of work in less time—during a

11  pandemic—in terms of verifying signatures, etc. However, as explained *infra* during the

12  likelihood of success on the merits analysis, the violation of Plaintiffs' First Amendment

13  rights outweighs the administrative inconvenience Defendants will suffer. Moreover,

14  whatever extension of the Deadline Plaintiffs end up obtaining will also be available to the

15  one other group seeking to get an initiative on the November 2020 ballot to amend

16  Nevada's constitution. Thus, the interested public will also benefit if the Court issues an

17  injunction here. In addition, Nevada citizens will benefit if there are one or more initiatives

18  to amend Nevada's constitution on the November 2020 ballot because each added

19  initiative "likely *increases* the 'total quantum of speech' on public issues[.]" *Angle*, 673 F.3d

20  at 1133. In sum, the Court finds the balancing of the equities and public interest factors

21  also weigh in favor of granting Plaintiffs' PI Motion in part.

22  **V.      CONCLUSION**

23         The Court notes that the parties made several arguments and cited to several cases

24  not discussed above. The Court has reviewed these arguments and cases and determines

25  that they do not warrant discussion as they do not affect the outcome of the issues before

26  the Court.

27         It is therefore ordered that Plaintiffs' motion for preliminary injunction (ECF No. 2)

28  is granted in part, and denied in part. NRS § 295.056(3) is unconstitutional as applied to

1  Plaintiffs by Defendant Barbara Cegavske under the unique factual circumstances of this

2  case. Plaintiffs' motion for preliminary injunction is otherwise denied in all other respects.

3        It is further ordered that Defendant Barbara Cegavske's motion to dismiss (ECF

4  No. 25) is denied.

5        DATED THIS 29th day of May 2020.

6

7  _____

8  MIRANDA M. DU
   CHIEF UNITED STATES DISTRICT JUDGE